OSTERHOLM, RESPONDENT, *v.* BOSTON & MONTANA CON. C. & S. MINING CO., APPELLANT.

(No. 2,759.)

(Submitted February 7, 1910.  Decided February 26, 1910.)

[107 Pac. 499.]

*Personal Injuries—Mines—Master and Servant—Safety-cages— Statutory Construction — Evidence — Assumption of Risk — Nature of Defense—Contributory Negligence.*

Personal Injuries—Evidence—Earning Capacity.
    1.  While testimony as to the sobriety and industry of plaintiff in a personal injury action was incompetent if designed to refer to his conduct at the time of the accident, it was proper as bearing upon his earning capacity, where the witness to whom the question was propounded had testified to the wages plaintiff was earning when he was injured.

Statutory Construction.
    2.  Where a statute is plain, certain and unambiguous, so that no doubt arises from its own terms as to its scope and meaning, interpretation is needless; it should be construed according to the natural and most obvious import of the language employed, without resorting to subtle and forced construction for the purpose of either limiting or extending its operation.

Personal Injuries—Mines—Safety-cage Statute—Construction.
    3.  Section 8536, Revised Codes, requires that the doors on cages used in mining shafts more than 300 feet in depth, when not engaged in the operation of "sinking," must be closed when lowering or hoisting "*the men.*"  *Held,* under the rule of statutory construction, that the plural includes the singular, that the word "men" applies to the hoisting or lowering of one man, as well as to the men in a body when going on or off shift.

Same.

4. The term "sinking" through a vertical shaft, in mining, means excavating downward without substantial deviation from a straight line, extending from the point of beginning toward the center of the earth; hence the provision of section 8536, Revised Codes, that when the cages are used for sinking only they need not be provided with doors, has no application to the cutting of stations, even though the latter operation be a necessary part of the process of sinking.

Same—Evidence—Earning Capacity.

5. After plaintiff had testified that he had earned from $3.50 to $4.50 a day at the mine in which he was injured, and that he had followed contracting, his further statement that when contracting he had made "$6 and always over and sometimes under," was competent as bearing upon his earning capacity.

Same—Safety-cages—Absence of Doors—Waiver.

6. Plaintiff, whose limb was crushed between the plate of a mining shaft and the cage on which he was being hoisted, he having slipped, with the result that his limb extended through the opening which should have been safeguarded by a door as provided by the safety-cage statute (Revised Codes, section 8536), cannot be said to have waived the absence of the door by a request that it be removed, made by him some three months before the accident, where, between the time it was removed and the date of the injury, he had left the defendant's service, and where in the meantime much sinking had been done, during which operations there was no necessity for a door.

Same—Contributory Negligence—What does not Constitute.

7. Plaintiff, while working in a mine, was requested by his foreman to go to a higher station, and followed the latter onto the cage. Plaintiff started to ring the bell to signal the hoist and found the bell rope wet and the bell hard to ring. As he was ringing the last bell, he slipped, struck his elbow, and fainted. His leg was caught between the wall plate and the cage, resulting in the injuries complained of. *Held,* that plaintiff was not guilty of contributory negligence.

Same—Excessive Verdict.

8. *Held,* that a verdict for the sum of $7,500 to recompense plaintiff, a miner, who at the time of the accident was earning $4.50 a day, for injuries sustained as stated in paragraph 6 above, was not excessive, where his physician had testified that it would probably be two years from the date of the trial before plaintiff would be able to go about, though it would be a question whether he could pursue his vocation that soon.

Same—Motion for Directed Verdict—Effect.

9. Defendant company had pleaded, among others, the defense of assumption of risk. Its motion for a directed verdict, asked for on the ground that negligence on its part had not been shown, having been denied, a like motion in his favor was made by plaintiff and granted, over defendant's objection that it eliminated the question of assumption of risk. Instructions covering that defense were then offered by it, but refused by the court, defendant preserving exceptions to the rulings of the court. *Held,* that by asking for a directed verdict, defendant did not waive its right to have any contested question of fact remaining in the case submitted to the jury for determination.

Same—Assumption of Risk—Nature of Defense.

10. The defense of assumption of risk has for its basis the common-law principle expressed by the maxim, "*Volenti non fit injuria*," and does not rest in contract between the master and servant; hence that .

defense was not abrogated by section 16, Article XV, of the Constitution, and sections 5052 and 5053, Revised Code, which provide that a contract releasing an employer from liability for his negligence is void.

Same—Safety Appliances—Statutory Provisions—Disobedience—Effect.
11.    The failure of the defendant company to equip the cage upon which plaintiff was being hoisted with doors, as required by the safety-cage statute (Revised Codes, section 8536), did not deprive it of the right to interpose the defense of assumption of risk or contributory negligence. The statute does not impose this additional penalty for its omission of duty in this regard, and the one imposed may not be augmented by implication.

Same—Assumption of Risk—Appreciation of Danger—Question for Jury.
12.    In order to hold plaintiff in a personal injury action precluded from recovery because of assumption of risk, it is necessary that the testimony should disclose, not only that he knew of the physical conditions surrounding him, but that he appreciated the danger therefrom; and if different men of fair, sound minds might draw different conclusions from the evidence, the question must be submitted to the jury.

*Appeal from District Court, Silver Bow County; Geo. M. Bourquin, Judge.*

ACTION by Charles Osterholm against the Boston and Montana Consolidated Copper and Silver Mining Company. Judgment for plaintiff, and defendant appeals from it and an order denying it a new trial. Reversed and remanded.

*Messrs. Forbis & Evans* and *Messrs. Kremer, Sanders & Kremer* submitted a brief in behalf of Appellant. *Mr. L. O. Evans* and *Mr. L. P. Sanders* argued the cause orally.

The general rule is that in an action of this character where there is positive testimony as to what care and caution the injured person actually exercised to prevent or avoid the injury, it is error to admit testimony in relation to his habits as to sobriety and carefulness. (*Illinois Central Ry. Co.* v. *Borders,* 61 Ill. App. 55; *Illinois Central Ry. Co.* v. *Pummill,* 58 Ill. App. 83; *Chicago etc. Ry. Co.* v. *Anderson,* 47 Ill. App. 91.)

Evidence of plaintiff's habits and usual conduct as to a particular act is not admissible on the question of contributory negligence. (*Lake Erie etc.* v. *Morain,* 140 Ill. 117, 29 N. E. 869; *Atlanta etc. Ry. Co.* v. *Newton,* 85 Ga. 517, 11 S. E. 776; *City of Junction* v. *Blade,* 1 Kan. App. 85, 41 Pac. 677.) The

habits of one injured are not available evidence for either the plaintiff or defendant. (*Guggenheim* v. *Lake Shore etc. Ry. Co.,* 66 Mich. 150, 33 N. W. 161; *Hill* v. *Snyder,* 44 Mich. 318, 6 N. W. 674; *Langworthy* v. *Township etc.,* 88 Mich. 207, 50 N. W. 130.)

When a statute is of doubtful meaning or ambiguous, due regard must be given to contemporaneous construction, and if that contention is generally received and acquiesced in, it will not be disturbed except for weighty reasons. (6 Current Law, 1539; *State* v. *Northern Pac. Ry. Co.,* 95 Minn. 43, 103 N. W. 731.) Where a statute regulating the manner of conducting an industry is ambiguous, courts will receive as an aid to the interpretation the construction which practical persons engaged in the industry generally place upon it. (*Himrod Coal Co.* v. *Stevens,* 104 Ill. App. 639; *People* v. *Borda,* 105 Cal. 636, 38 Pac. 1110.) Courts, in construing or interpreting a statute, give much weight to the interpretation put upon it at the time of its enactment by those whose duty it has been to construe, execute and apply it. (26 Am. & Eng. Ency. of Law, 2d ed., 633.)

Could the court deprive the defendant company of the defense of assumption of risk? We submit that under the authorities it could not have done so. Section 8526, Revised Codes, does not provide a person violating the statute shall not be permitted to plead assumption of risk upon the part of a person injured through such violation. We maintain that the doctrine of assumption of risk is a principle of the common law, and must be repealed, if at all, by the law-making power, and that, being a principle of the common law, it cannot be repealed by implication, but must be repealed by positive enactment. The doctrine is founded upon public policy, and grows out of the status assumed by master and servant, and upon the maxim, "*Volenti non fit injuria*," and does not grow out of a contractual relation. (See *Rase* v. *Minneapolis etc. Ry. Co.,* 107 Minn. 260, 120 N. W. 360, 21 L. R. A., n. s., 138; *Denver & Rio Grande R. Co.* v. *Norgate,* 141 Fed.

247, 72 C. C. A. 365, 6 L. R. A., n. s., 981; *Sutton v. Des Moines Baker Co.*, 135 Iowa, 390, 112 N. W. 836; *Spiva v. Osage Coal Min. Co.*, 88 Mo. 68; *Knisley v. Pratt*, 148 N. Y. 372, 42 N. E. 986, 32 L. R. A. 367; *Federal Lead Co. v. Swyers*, 161 Fed. 687; *Seely v. Tennant*, 104 Minn. 354, 116 N. W. 648; *Denver & Rio Grande R. Co. v. Gannon*, 40 Colo. 195, 90 Pac. 853, 11 L. R. A., n. s., 216; *Kiernan v. Eidlitz*, 115 App. Div. 141, 100 N. Y. Supp. 732; *Andrews v. Chicago etc. Ry. Co.*, 96 Wis. 348, 71 N. W. 372; *Sweeney v. Central Pac. Ry. Co.*, 57 Cal. 19; *Krause v. Morgan*, 53 Ohio St. 26, 40 N. E. 886; *Kleinest v. Kunhardt*, 160 Mass. 230, 35 N. E. 458; *Michigan H. & H. Co. v. Wheeler*, 141 Fed. 61, 72 C. C. A. 71; *Marshall v. Norcross*, 191 Mass. 568, 77 N. E. 1151; *Louisville & N. R. Co. v. Banks*, 104 Ala. 508, 16 South. 547; *Martin v. Chicago etc. Ry. Co.*, 118 Iowa, 148, 96 Am. St. Rep. 371, 91 N. W. 1034, 59 L. R. A. 698; *Hall v. West & Slade Mill Co.*, 39 Wash. 447, 81 Pac. 915.)

Neither has the defense of contributory negligence been abrogated nor in any way affected by the Act. Unless the statute affirmatively provides that this defense shall not avail the master—and the Montana law is silent altogether upon this question—"it is clear that contributory negligence will bar a plaintiff's recovery when the defendant has violated a statutory obligation, for the reason that the defendant's breach is in such a case, not the proximate cause of the injury." (1 Dresser's Employers' Liability, sec. 116, p. 597; see, also, *Lake Erie etc. R. Co. v. Craig*, 73 Fed. 642, 19 C. C. A. 631; *Victor Coal Co. v. Muir*, 20 Colo. 320, 46 Am. St. Rep. 299, 38 Pac. 378, 26 L. R. A. 435; *Anderson v. C. N. Nelson Lumber Co.*, 67 Minn. 79, 69 N. W. 630; *Norfolk etc. Ry. Co. v. Cheatwood's Admx.*, 103 Va. 356, 49 S. E. 489; *Knezevich v. Bush T. Co.*, 126 App. Div. 675, 111 N. Y. Supp. 255; *Buckner v. Richmond & D. Ry. Co.*, 72 Miss. 873, 18 South. 449; *Schulte v. Pfaudler Co.*, 150 Mich. 427, 113 N. W. 1120; *Bundy v. Union Iron Works*, 46 Wash. 231, 89 Pac. 545; *Southern Cotton Oil Co. v. Skipper*, 125 Ga. 368, 54 S. E. 110; *Atlantic Coast Line R. Co. v. Ryland*, 50

Fla. 190, 40 South. 24; *Dumphy* v. *New York etc.*, 196 Mass. 471, 82 N. E. 675, 13 L. R. A., n. s., 1152; *Queen* v. *Dayton Coal Co.*, 95 Tenn. 458, 49 Am. St. Rep. 935, 32 S. W. 460, 30 L. R. A. 82; *Kilpatrick* v. *Grand Trunk Ry. Co.*, 72 Vt. 263, 82 Am. St. Rep. 939, 47 Atl. 827; *Illinois C. Ry. Co.* v. *Jordan*, 117 Ky. 512, 78 S. W. 426; *Smith* v. *Atchison etc. Ry. Co.*, 39 Tex. Civ. 468, 87 S. W. 1052; *Klotz* v. *Power etc. Co.*, 136 Wis. 107, 116 N. W. 770, 17 L. R. A., n. s., 904; *Krause* v. *Morgan*, 53 Ohio St. 26, 40 N. E. 886; *Johnson* v. *Mammoth Vein Coal Co.*, 88 Ark. 243, 114 S. W. 722, 123 S. W. 1180, 19 L. R. A., n. s., 646.)

Excluding the decisions in states where the liability statute expressly takes away the defense of contributory negligence, the overwhelming weight of authority holds that this defense is available under Acts of the character under discussion. The text-writers uniformly sustain this view. (See *Hancock* v. *N. & W. Ry. Co.*, 124 N. C. 222, 32 S. E. 679; *Whitcomb* v. *Standard Oil Co.*, 153 Ind. 513, 55 N. E. 440; *Pittsburgh etc. Ry. Co.* v. *Collins*, 163 Ind. 569, 71 N. E. 661; *Millsap* v. *Beggs*, 122 Mo. App. 1, 97 S. W. 956; *Lee* v. *Sterling Silk Mfg. Co.*, 115 App. Div. 589, 101 N. Y. Supp. 78; *Pittsburgh etc. Ry. Co.* v. *Lightheiser*, 163 Ind. 247, 71 N. E. 218; *Cleveland etc.* v. *Ullom*, 20 Ohio C. C. 512; *Crawford etc. Co.* v. *Gose* (Ind. App.), 82 N. E. 984; *Kansas etc. Brick Mfg. Co.* v. *Stark*, 77 Kan. 648, 95 Pac. 1047; *Cleveland etc. Co.* v. *Curtis*, 134 Ill. App. 565; *Cincinnati etc. Ry. Co.* v. *Holland*, 117 Tenn. 257, 96 S. W. 758; *Ashman* v. *Flint*, 90 Mich. 567, 51 N. W. 645; *Christner* v. *Cumberland etc.*, 146 Pa. 67, 23 Atl. 221; *Dewey* v. *Chicago etc. Ry. Co.*, 31 Iowa, 373.)

There was a brief in behalf of Respondent by *Messrs. Breen & Hogevoll,* and oral argument by both.

Testimony that the plaintiff's time was spent in a useful occupation, and not squandered in pleasure-seeking and dissipation, was admissible with reference to proving his earning

capacity. (Thompson on Negligence, sec. 7287, and cases cited.) Assumption of risk rests on contract, but contributory negligence rests on a different principle. Judge Taft says in the *Narramore Case* that statutes of the character of the one here involved are for the benefit of the servant, and a servant is not liable for contributory negligence because he does that which a great many servants are willing to do. So, in the case at bar, all the servants were willing to work in this mine when the cage was running without doors in violation of law. If there was anything, there was a contract to do it, and thereby the servant assumed risk, but under our Constitution, which prohibits any contract excusing the master for negligence against servants, there could be no assumption of risk. The weight of authority is against the contention of appellant on this subject. The latest note on the subject is in 13 Am. & Eng. Ann. Cas. 33. Another late decision is found in *Dumphy* v. *New York etc. R. R. Co.*, 196 Mass. 471, 82 N. E. 675, 13 L. R. A., n. s., 1152; and also *Denver etc. R. R. Co.* v. *Norgate*, 141 Fed. 247, 72 C. C. A. 365, 6 L. R. A., n. s., 981. In the case of *Johnson* v. *Mammoth Vein Coal Co.*, 88 Ark. 243, 114 N. W. 722, 123 S. W. 1180, 19 L. R. A., n. s., 646, the court names the following states as holding that the servant may assume the risk: Alabama, Massachusetts, Iowa, Rhode Island, Minnesota, New York, Ohio and Wisconsin. The states holding the contrary are named as follows: Illinois, Indiana, Louisiana, Michigan, Missouri, Virginia, Washington. Since that decision the following states have adopted the theory of Judge Taft: Montana, in the case of *Monson* v. *La France Copper Co.*, 39 Mont. 50, 101 Pac. 245; the circuit court of appeals, United States circuit, in California, in the case of *Welsh* v. *Barber Asphalt Paving Co.*, 167 Fed. 465. To that eminent court may be added Oregon and Kansas. Gilbert, Circuit Judge, writes the opinion and cites practically all the cases *pro* and *con*, and the circuit court of San Francisco overrules the circuit court of Oregon. Appellant argues that the doctrine of *volenti non fit injuria* applied in the case at bar. The circuit court of appeals in San Fran-

cisco says that it does not apply. (See page 471 of opinion; see, also, *Inland Steel Co.* v. *Yedinak* (Ind.), 87 N. E. 229, where the following cases are cited: *Davis Coal Co.* v. *Pollard*, 158 Ind. 607, 92 Am. St. Rep. 319, 62 N. E. 492; *Monteith* v. *Kokomo etc. Co.*, 159 Ind. 149, 64 N. E. 610, 58 L. R. A. 944; *Island Coal Co.* v. *Swaggerty*, 159 Ind. 664, 62 N. E. 1103, 65 N. E. 1026; *Green* v. *American Car etc. Co.*, 163 Ind. 135, 71 N. E. 268; *Davis* v. *Mercer Lumber Co.*, 164 Ind. 413, 73 N. E. 899; *Robertson* v. *Ford*, 164 Ind. 538, 74 N. E. 1; *Bessler* v. *Laughlin*, 168 Ind. 38, 79 N. E. 1033.)

By consent of parties, the matters of fact and matters of law were decided by the court, and could not be left to the jury, by reason of the fact that both parties asked for a directed verdict. (See *Buetell* v. *Magone*, 157 U. S. 155, 15 Sup. Ct. 566, 39 L. Ed. 654; *Home Savings Bank* v. *Woodruff* (N. M.), 94 Pac. 957; *Merwin* v. *Magone*, 70 Fed. 777, 17 C. C. A. 361; *Bradley Timber Co.* v. *White*, 121 Fed. 784, 58 C. C. A. 55; *Phenix Ins. Co.* v. *Kerr*, 129 Fed. 724, 64 C. C. A. 251, 66 L. R. A. 571; *Stanford* v. *McGill*, 6 N. D. 573, 72 N. W. 938, 38 L. R. A. 773; *First Nat. Bank* v. *Hayes*, 64 Ohio St. 101, 59 N. E. 893.) We argue that when the court ruled in favor of the plaintiff, that it ruled on questions of law and fact. No matter could be submitted to the jury except to fix the amount of damages, if there was any evidence to sustain the plaintiff's case. To the same effect are citations in 3 Current Law, 1095; 5 Current Law, 1008; 7 Current Law, 1153; 9 Current Law, 980; 11 Current Law, 1091. (See, also, *Mead* v. *Darling*, 159 Fed. 684, 86 C. C. A. 552.)

MR. JUSTICE SMITH delivered the opinion of the court.

The complaint in this action alleges: That on or about the eighteenth day of October, 1907, the defendant was operating the Greenleaf mine, in Silver Bow county, by means of a vertical shaft approximately 1,000 feet deep; that the cage in said shaft was without doors or safety gates and was not used for sinking;

that on the day mentioned plaintiff was in the employ of the defendant as a miner, and while being hoisted in the cage ''the defendant caused this plaintiff to slip through the open cage with no doors,'' whereby he was permanently injured. The answer alleges: (1) That the cage was used for sinking only, and ''the only hoisting and lowering of men that was being done was the hoisting and lowering of men engaged in sinking the shaft, and no other operations were being carried on in the mine''; (2) ''that the condition of said cage and its construction was open and visible, and the said plaintiff had been working in said shaft, and had been lowered and hoisted upon said cage, in the condition in which it was when he was injured, for several months prior to the accident and knew of the condition and manner of construction of said cage, or in the exercise of reasonable care should have known thereof, and defendant alleges that the danger of being injured, if his feet slipped out of said cage while being hoisted or lowered, was an open and obvious risk, and the plaintiff assumed the risk thereof''; (3) contributory negligence of plaintiff; (4) that the doors or gates were removed from the cage at the plaintiff's request, and he is therefore estopped to claim any liability on the part of the defendant for failure to maintain the same in place upon the cage; (5) that plaintiff's injury was caused by the negligence of fellow-servants in removing the safety doors or gates.

There was no conflict in the testimony as to the manner in which plaintiff was injured. He testified: ''I was timbering in the Greenleaf mine. We were putting in the sill for the last set of timbers at the 1,000 station. The tanks were running over on the 800, and the foreman called me to go up with him and see what was the matter. I followed him into the cage and started to ring the bell. The bell rope was wet and hard to ring. As I was ringing the last bell, I slipped and struck my elbow, and it knocked me out until I came within three or four feet of the 800 station, and my leg was in between the wall plate and the cage. I did not see any doors on the cage when I started to work on June 26, 1907, and I certainly would

have seen them if there had been any doors there, and there were no doors on the cage when I was hurt. Sinking is straight down in the shaft. I know what is meant by building stations. Sinking is not the same as building stations." He was badly injured; but his physician testified that: "In a couple of years he will be in fairly good shape. His leg will be substantially so recovered that he can perform the duties that he did perform prior to any injuries at all. I think in time it will come to that —what time is difficult to state. I think in two years he will be so he can go about. It is a question if he can go down the mine that soon. He will probably go about without crutches. It is my judgment that long prior to that time he will be able to perform manual labor of some kind."

Shone, the foreman, testified that, after plaintiff pulled the bell rope, he fainted, fell down, and got his leg under the wall plate. "His leg was pulled in right to the knee between the wall plate and the cage. The station in which he was standing when he first went in the cage was on the south side, and his foot got out on the south side."

At the close of the evidence, both parties moved for a directed verdict. The court overruled the defendant's motion, but granted that of the plaintiff, leaving the jury to fix the amount of the recovery. This they did by returning a verdict against the defendant for the sum of $7,500. From a judgment entered upon the verdict and an order denying a new trial, the defendant has appealed. The legal questions presented to this court were all properly raised by motion for nonsuit, objections and exceptions taken at the trial, motion for directed verdict, and requests for instructions.

1. The first complaint is that plaintiff's witness Johnson was allowed, over objection, to answer the following question: "What have you to say as to his [plaintiff's] habit of being a sober and industrious man?" The question was incompetent if designed to bear upon the conduct of plaintiff at the time of the accident. But the witness had already testified that plaintiff was getting $4.50 per day, and, as bearing upon his

earning capacity, we think the question was proper. At any rate, the answer was not prejudicial. The witness answered, "He takes a drink, but I never saw him drunk."

2. Our statute relating to safety doors or gates on cages in mines reads as follows: "It is unlawful for any corporation [or person] to sink or work, through any vertical shaft where mining cages are used, to a greater depth than three hundred feet, unless said shaft shall be provided with an iron-bonneted safety cage, to be used in the lowering and hoisting of the employees thereof, said cage to be also provided with sheet iron or steel casing not less than one-eighth inch in diameter; doors to be made of the same material shall be hung on hinges, or may be made to slide, and shall not be less than five feet high from the bottom of the cage, and said door must be closed when lowering or hoisting the men. Provided, that when such cage is used for sinking only, it need not be equipped with such doors as are hereinbefore provided for. The safety apparatus, whether consisting of eccentrics, springs or other device, must be securely fastened to the cage, and must be of sufficient strength to hold the cage loaded at any depth to which the shaft may be sunk. The iron bonnet of the aforesaid cage must be made of boiler sheet iron, of good quality, of at least three-sixteenths of an inch in thickness, and must cover the top of such cage in such manner as to afford the greatest protection to life and limb from anything falling down said shaft. It shall be the duty of the mining inspector and his assistant to see that all cages are kept in compliance with this section and to also see that the safety dogs are kept in good order. Every person or corporation failing to comply with any of the provisions of this section is punishable by a fine of not less than three hundred dollars nor more than one thousand dollars." (Revised Codes, sec. 8536.)

It is contended by the appellant that the phrase "said door must be closed when lowering or hoisting the men" should be construed so that it shall not be imperative to close the safety door when men engaged in the shaft are riding up or down, but only when the "shifts" of men are being lowered or hoisted

at the usual time of changing workmen. Counsel argue that there is uncertainty and ambiguity in the language quoted, and therefore it was their privilege to introduce testimony to explain how the law is usually regarded and interpreted by persons in charge of large mining operations; and they contend that the phrase should be construed by this court in the light of testimony, as to the practical operation of mines and what they claim to have been the reason for employing the words "the men" and failing to specify that the door should be closed whenever any one man was being moved. Such testimony was in fact introduced at the trial. Several mining men of laige experience in the mines of Butte and elsewhere, superintendents, foremen and others, gave evidence to the effect that "lowering and hoisting the men is when the shift is going on or coming off," and that taking one man up or down would not be "hoisting or lowering the men." We have no doubt, from this testimony, that such is the interpretation generally placed upon the law by those in charge of the large mining operations in Silver Bow county, and that such interpretation is an honest and *bona fide* construction of the law on their part, without any design to evade its provisions, but rather to facilitate its practical operation. Neither have we any doubt that the primary object of the law, and the one foremost in the minds of the legislators who passed it, was to guard against accidents to the men, in a body, when changing works. But we are also satisfied that, in its broader scope, the law was designed to minimize, so far as may be, the possibility of accident or death to miners, at any time, when the presence of doors will prevent it.

We cannot agree with counsel that the terms of the law are ambiguous or uncertain. "Ambiguous" means doubtful and uncertain. But we are of opinion that there is nothing uncertain about this statute, and no doubt of its meaning. If a statute is plain, certain and unambiguous, so that no doubt arises from its own terms as to its scope and meaning, a bare reading suffices; then interpretation is needless. (*Smith* v. *Williams*, 2 Mont. 195; *Jay* v. *School District*, 24 Mont. 219, 61 Pac. 250;

*State* v. *Cudahy Packing Co.,* 33 Mont. 179, 114 Am. St. Rep. 804, 82 Pac. 833, 8 Ann. Cas. 717; 2 Lewis' Sutherland on Statutory Construction, 2d ed., sec. 363.) This statute commands that the door shall be closed when lowering or hoisting the men. The plural includes the singular. Indeed, it is not contended but that the door must be closed in lowering or hoisting one man if, perchance, he happens to be the only employee going on or coming off "shift" at the time. It is not allowable to interpret what has no need of interpretation, or, when the words have a definite and precise meaning, to go elsewhere in search of conjecture in order to restrict or extend their meaning. Statutes should be read and understood according to the natural and most obvious import of the language, without resorting to subtle and forced construction for the purpose of either limiting or extending their operation. (*McCluskey* v. *Cromwell,* 11 N. Y. 593; *Benton* v. *Wickwire,* 54 N. Y. 226.) The supreme court of Mississippi has said: "A primary rule of construction is that the legislature must be assumed to have meant precisely what the words of the law, as commonly understood, import; and this may be said to be the fundamental and controlling rule of construction." (*Lemonius* v. *Mayer,* 71 Miss. 514, 14 South. 33; see, also, *Green* v. *Weller,* 32 Miss. 650.) We are of opinion that this feature of the law was correctly interpreted in the court below.

3. Again, it is contended by counsel for the appellant that the word "sinking," employed in the law, should be construed so as to include within its meaning what is called "station cutting," or cutting stations. They claim that the cutting of stations is a necessary part of the work of sinking, for the reason that sinking cannot be prosecuted beyond a certain depth without installing pumps at intervals, in order to draw off the impeding water, and that the pumps must be placed at stations made for that purpose. Several expert mining men testified to the facts relied upon by the appellant. The testimony on the part of the respondent was to the effect, however, that, while station cutting is necessary, it is not regarded as being included within the

process of sinking. The court below did not pass upon the question of fact, nor allow the jury to do so, but construed the statute literally, and we are of opinion that this course was correct. While there is considerable force in the suggestion of counsel, and the reasons assigned by the witnesses for their opinions are persuasive, yet they ought not to influence the judgment of courts. They may with propriety be addressed to the legislative branch of the government, with a view to amendment of the law, if deemed advisable. If it be true, as some of the witnesses testified, that every reason why doors should be omitted while sinking applies equally as well to the process of cutting stations, and that there is more danger to the men, while performing the latter operation, with doors than without them, that would seem an effective argument in favor of so amending the law as that it shall not be necessary to use doors on cages while cutting stations. But the courts cannot amend it; and, in effect, that is what we should do if we gave to the word "sinking" an enlarged meaning, or any meaning other than its ordinary, natural, and obvious one, to-wit: To descend; or go down. There is nothing technical about the word "sinking"; neither is it of doubtful meaning, uncertain or ambiguous. Therefore we may not interpret, save by applying to the word its precise and definite meaning. "Sinking through a vertical shaft," in mining, means to excavate downward, without substantial deviation from a straight line, extending from the point of beginning toward the center of the earth.

4. While the plaintiff was on the stand, he testified: "I was working here for $3.50, $3.75, $4 and $4.50. I have followed contracting." He was asked: "What did you make contracting?" Over objection, he answered: "I was always making six and always over and sometimes under." We think the testimony was competent as bearing upon his earning capacity.

5. It is argued that there is no testimony in the record disclosing any causal connection between the absence of gates and the injury to plaintiff. But Shone testified that Osterholm entered the cage from a station on the south side, and "his foot got off

on the south side." This shows, we think, that his foot extended out of the cage through an opening where there should have been a gate.

6. In view of what has already been said, the action of the court in allowing the witness Johnson to testify as to the practice in the Bi-Metallic, of closing the safety gates whenever men were in the cage, becomes immaterial.

7. The witness Shone testified that plaintiff complained of the gates and requested that they be removed. Plaintiff denied this. Shone also said that the gates were removed in July, at a time when the shaft was down thirty-five feet below the 800-foot station. It is clear from the testimony that much sinking was done after the removal of the gates. At this time there was no necessity for them, and the plaintiff, in then requesting their removal, cannot be said to have waived their absence at a later date after sinking had ceased. Between the time when the gates were removed and the date of the accident, plaintiff had left the defendant's service and had returned later at the foreman's request. Indeed, Shone himself said that he saw the necessity for gates before Osterholm was hurt.

8. Again, it is contended that the question of plaintiff's contributory negligence should have been submitted to the jury. We have quoted the testimony showing what the plaintiff did at the time of the accident. The point advanced is that he was guilty of contributory negligence in attempting to pull the bell rope in the condition in which he found it and in starting the cage in the manner adopted by him. We find in the case presented to us no evidence of contributory negligence on the part of the plaintiff. (See *Birsch* v. *Citizens' Electric Co.*, 36 Mont. 574, 93 Pac. 940.)

9. Neither are we able to agree with the contention of counsel that the verdict is excessive.

10. The most serious question presented is this: Was the defense of assumption of risk available to the defendant? Counsel for the respondent insist that defendant had no right to have any question of fact submitted to the jury, for the reason

that the right was waived by moving for a directed verdict. We cannot agree with this contention. The record discloses that the motion of the defendant was based upon the claim that no negligence had been shown on its part, and that the statute had not been violated. After this motion had been denied, counsel for plaintiff moved the court to direct a verdict in his favor, on the ground that defendant had "not shown any defense at all." This motion was granted, and an exception to the ruling was saved. Thereupon a peremptory instruction in favor of the plaintiff was formally presented. To this an objection was interposed "that it eliminated the questions of assumption of risk," etc. The objection was overruled, and an exception noted. Whereupon the defendant presented twenty requests for instructions, several of which related to the defense of assumed risk. These were all refused and exceptions noted. Under these circumstances, we do not think that the defendant waived its right to go to the jury, if any contested question of fact remained in the case for determination. (*Seddon* v. *Tagliabue*, 50 Misc. Rep. 156, 98 N. Y. Supp. 236.) In the case of *Empire State Cattle Co.* v. *Atchison etc. Ry. Co.*, 210 U. S. 1, 28 Sup. Ct. 607, 52 L. Ed. 931, Mr. Justice White, speaking for the supreme court of the United States, said: "Nothing [in a previous ruling] sustains the view that a party may not request a peremptory instruction, and yet, upon the refusal of the court to give it, insist, by appropriate requests, upon the submission of the case to the jury, where the evidence is conflicting, or the inferences to be drawn from the testimony are divergent."

The argument advanced by counsel for the plaintiff is that the defense of assumption of risk rests in contract, and that therefore it is not available in this state, for the reason that both the Constitution (section 16, Article XV) and the statute (sections 5052, 5053, Revised Codes) declare that a contract releasing an employer from liability for his negligence is void. This question was raised in the case of *Monson* v. *La France Copper Co.*, 39 Mont. 50, 101 Pac. 243, but was not considered for the reason that there was no testimony in the case to show

how the plaintiff's husband came to his death. That is the only case in which the question has ever been raised, so far as we can ascertain; and it has never been decided. In the case of *Coulter* v. *Union Laundry Co.*, 34 Mont. 590, 87 Pac. 973, it was said: "The facts in the case show that plaintiff knew the danger and assumed the risk. Thereby she made a contract, not against public policy, as appears to us, to assume such risk." The question whether the defense of assumption of risk rests in contract, or has for its basis the maxim, *"Volenti non fit injuria,"* was not raised in the case and was not considered. The expression just quoted from the opinion was entirely *obiter*, and cannot be thought to preclude the court from a thorough examination of this important question, in the light of the able argument and elaborate briefs furnished us by counsel for both parties. Were it not for the constitutional and statutory provisions above referred to, it would probably be wholly immaterial upon what basis the defense is placed, and this consideration accounts, perhaps, for the fact that language has, inadvertently, been employed by many judges which a careful consideration of the particular case would show to have been not necessary or pertinent to the decision. When we reflect that the defense of assumption of risk has been interposed in many cases since the decision of the *Coulter Case,* and has been given effect by this court, it becomes apparent that the profession has not considered that the *Coulter Case* was intended to declare the law on the subject we are examining.

The defense of assumption of risk is based upon an old and well-established principle of the common law, and applies to other relations, as well as to that of master and servant. Indeed, it is recognized by section 6183 of the Revised Codes, which declares: "He who consents to an act is not wronged by it." We are then to inquire whether the defense has been taken away by statute. But first it is necessary to decide whether it is founded in contract. A leading decision of this question in the affirmative is found in the case of *Narramore* v. *Cleveland etc. R. Co.*, 96 Fed. 298, 37 C. C. A. 499, 48 L. R. A.

68, wherein the United States circuit court of appeals said: "Assumption of risk is a term of the contract of employment, express or implied from the circumstances of the employment, by which the servant agrees that dangers of injury obviously incident to the discharge of the servant's duty shall be at the servant's risk. In such cases the acquiescence of the servant in the conduct of the master does not defeat a right of action on the ground that the servant causes or contributes to cause the injury to himself; but the correct statement is that no right of action arises in favor of the servant at all, for, under the terms of the employment, the master violates no legal duty to the servant in failing to protect him from dangers the risk of which he agreed expressly or impliedly to assume."

In the case of *Green* v. *Western American Co.*, 30 Wash. 87, 70 Pac. 310, the doctrine of the *Narramore Case* is approved and adopted, and a majority of the same court, in *Hall* v. *West & Slade Mill. Co.*, 39 Wash. 447, 81 Pac. 915, adhered to the rule announced in the *Green Case*. We are of opinion, however, that the weight of modern authority is to the effect that the doctrine of assumption of risk, while, in most cases perhaps, incident to the relation of master and servant, does not grow out of any express or implied contract between the parties, but rather is founded in the principle, resting upon a sound basis of public policy, that he who consents to an act will not be heard to claim that he is wronged by it. Indeed, the supreme court of Washington, in the case of *Hall* v. *West & Slade Mill. Co., supra,* said: "But we do not wish to be understood as conceding that the [Green] case is without authority in its support. While it may be true, as the appellant contends, that the weight of authority is against it, yet we find it supported by courts respectable in numbers as well as ability." Mr. Justice Root, with the concurrence of two of his associates, filed a dissenting opinion in the *Hall Case,* in which he said: "The argument of respondent is based upon the theory that assumed risk rests upon contract. This theory is correct, if at all, only in a qualified sense. Instead of arising from the contract of employment

of the parties, it is based upon broader grounds, considerations involving the contract, public policy, and the status which the parties acquire by reason of the employment and the conditions surrounding the working place.  The doctrine, *'Volenti non fit injuria'* (one who, knowing and appreciating a danger, voluntarily assumes the risk of it), is so in accord with common sense and right that its application cannot be deemed to have been denied, unless by language clearly evidencing such an intention. * * *  This defense [assumption of risk] can be interposed against the servant, not because he agreed that it might be, but because the law says it may.''

In the case of *Rase* v. *Minneapolis etc. Ry. Co.,* 107 Minn. 260, 120 N. W. 360, 21 L. R. A., n. s., 138, the supreme court of Minnesota held that assumption of risk is based, not upon the contract, but on the principle expressed by the maxim, *"Volenti non fit injuria."*  The opinion, written by Mr. Justice Jaggard, reviews all of the cases, English and American, and in our judgment reaches a logical conclusion.

The circuit court of the United States, in *Denver etc. R. Co.* v. *Norgate,* 141 Fed. 247, 72 C. C. A. 365, 6 L. R. A., n. s., 981, said: ''The law regarding the assumption of risk is the law which governs the relation of master and servant, and is independent of the will of either.  It is not a term of the contract of employment.  If it were, then the master and servant could retain it or abolish it in each contract of employment.  But they can do neither.  It is a principle of the common law, and must be repealed, if at all, by the law-making power.  It is the law of the land governing all persons who assume the relation of master and servant.  It is over and above the contract, and depends in no manner for its existence upon the agreement of the parties.  It is founded upon public policy, the status assumed by master and servant, and upon the maxim, *'Volenti non fit injuria.'*  The law establishing the reciprocal duties and obligations of master and servant never originated out of contract, in the sense that the master and servant ever expressly

agreed to them. But the common law imposed these duties and obligations as a regulation of those who assumed this relation, regardless of the desires of the master or the servant."

We are of opinion that the defense of assumption of risk is still generally available in this state in an action between servant and master. (See, also, 12 Current Law, p. 741.) But it is urged by the respondent that it is not available when the injury to the servant is occasioned by failure of the master to observe a duty imposed by statute. The argument advanced is that by implication the "safety-cage" statute repeals the common-law rule and takes away the defense. There is considerable conflict of authority upon the point. In some states particular statutes are held to more or less expressly bar the defense of assumption of risk as to certain employments, and in other states the defense is abolished generally, by statute or constitutional provision. In this state the statute we have under consideration does not expressly abrogate the defense; neither is it taken away by any general statute to which our attention has been directed, or which we have been able to discover.

It must be borne in mind that the statute is penal in character. It relates exclusively to the duty of equipping cages in a certain manner, and the penalty for failure of compliance is fixed in the law itself. If the legislature had in mind any other penalty, it might easily have said so; and the fact that it did not furnishes a presumption that it had no such intention. There is not anything in the statute relating to the defense of assumed risk. Indeed, there is no word relating in the remotest degree, either directly or indirectly, to any action for personal injuries by the servant against the master. There is nothing to indicate that the law-making body had any other thought than that the employer should be compelled, by fear of criminal prosecution, to provide for the employee certain safety appliances, which, experience had taught, should be furnished in any event. The courts are almost unanimously agreed that a failure to comply with the law constitutes negligence *per se,* but the sole effect is to remove

the question of primary negligence from the realm of uncertainty. The burden of establishing his case in all other respects rests upon the plaintiff, to the same extent that it did before the enactment of the statute. Before the statute was passed, the defendant could have been successfully charged with negligence, by showing that he had failed to exercise ordinary care to provide a reasonably safe place in which to work, and reasonably safe appliances with which to prosecute the work.

There is to our minds no force in the argument found in some of the decided cases, that the legislature intended to abrogate the defense of assumption of risk as an additional punishment for failure to comply with the statute. If it had such intention, it would presumably have employed apt words to express it. The penalty imposed by statute is not to be augmented by implication. To add to this statute the words necessary to convey the idea that persons engaged in mining are prohibited from relying upon the long-established common-law defense sought to be invoked in this case would be to do violence to every rule of construction of statutes of which we have any knowledge. The initial rule is that the intention of the legislature must be gathered from the language employed, and, where that is plain and of definite meaning, it is to be followed; judicial construction is not permitted. The language is to be understood in its usual and ordinary significance. It is impossible to misunderstand the language of the Act we are considering. The courts have no more authority to add a penalty not therein expressed than they would have to add corporal punishment to that of imprisonment in the ordinary criminal prosecution. There is no authority in courts to give a statute a meaning contrary to the plain import of the language used. That would be judicial legislation, and, however firmly the judges might be of opinion that they could improve the law, the people have not intrusted to them the authority to change it to conform to their ideas. The following authorities bear out the views we entertain: *Bridges* v. *Tennessee etc. R. Co.*, 109 Ala. 287, 19 South. 495; *Martin* v. *Chicago, R. I. & P. R. Co.*, 118 Iowa, 148, 96 Am.

St. Rep. 371, 91 N. W. 1034, 59 L. R. A. 698; *Langlois* v. *Dunn Worsted Mills*, 25 R. I. 645, 57 Atl. 910; *Kreider* v. *Wisconsin R. P. & P. Co.*, 110 Wis. 645, 86 N. W. 662; *Krause* v. *Morgan*, 53 Ohio St. 26, 40 N. E. 886; *Birmingham Ry. & E. Co.* v. *Allen*, 99 Ala. 359, 13 South. 8, 20 L. R. A. 457; *Nottage* v. *Sawmill Phoenix* (C. C.), 133 Fed. 979; *Denver etc. R. Co.* v. *Gannon*, 40 Colo. 195, 90 Pac. 853, 11 L. R. A., n. s., 216; *Federal Lead Co.* v. *Swyers*, 161 Fed. 687, 88 C. C. A. 547; *Knisley* v. *Pratt*, 148 N. Y. 372, 42 N. E. 986, 32 L. R. A. 367; *Spiva* v. *Osage C. & M. Co.*, 88 Mo. 68; *Mika* v. *Passaic Print Works*, 76 N. J. L. 561, 70 Atl. 327; *Marshall* v. *Norcross*, 191 Mass. 568, 77 N. E. 1151.

It is manifest, from a reading of our statute, that the legislature did not intend, or attempt, to establish a measure of liability at variance with the ancient principles of the common law; and therefore it was the right of the defendant to rely upon its pleaded defense of assumption of risk. What has heretofore been said applies equally as well to the defense of contributory negligence.

The learned counsel for the appellant have directed the greater part of their argument to the questions we have already discussed; but one ground of their motion for a nonsuit was that the testimony showed that the plaintiff had, as a matter of law, assumed the risk. We find no discussion of this question in the respondent's brief. In order to hold that the plaintiff is precluded from recovery because of assumption of risk, it is necessary that the testimony should disclose, not only that he knew of the physical conditions surrounding him, but that he knew and appreciated the danger therefrom. (*Hollingsworth* v. *Davis-Daly Estates Copper Co.*, 38 Mont. 143, 99 Pac. 142.) If, upon this latter question, different men of fair, sound minds might draw different conclusions, then the question must be submitted to the jury. (*Anderson* v. *Northern Pacific Ry. Co.*, 34 Mont. 181, 85 Pac. 884.) The testimony before us shows that there was a difference of opinion as to whether the cage was safer

with doors, or without them, while the work of cutting stations was being prosecuted.   While the actual work of sinking was in progress, plaintiff had no right to demand the presence of doors. The managers of the mine were of opinion, not only that a cage without doors was safer while cutting stations, but that the law did not impose any duty to place doors thereon at that time. Whether or not the plaintiff entertained the same opinion is not disclosed; but he might well have done so in equal good faith· with his employers.   Under these circumstances, we cannot say that the testimony conclusively shows that he appreciated the danger, or that, as a matter of law, he assumed the risk.   In the case of *Rase* v. *Minneapolis etc. Ry. Co., supra,* Mr. Justice Jaggard said: "It is clear that his appreciation of the risk was for the jury.   He had no special occasion to animadvert to the possible danger.   He had done his usual work with safety under the same conditions.   No peril necessarily confronted him.   Was he bound to reason that if something should cause him to fall, and that if he should fall in the direction of the shaft, and that if it should at the time be in motion, he might be hurt?   *   *   * We think that it was error to hold him to have assumed the risk as a matter of law, because, as Ryan, J., said in *Dorsey* v. *Construction Co.,* 42 Wis. 583, 'the consequence of acquiescence ought to rest upon positive knowledge   *   *   *   of the precise danger assumed, and not on vague surmise of the possibility of danger.' "

It is contended, finally, that the complaint does not state facts sufficient to constitute a cause of action.   The pleading is not well drawn, in the light of the testimony, and does not set forth the *facts* constituting the cause of action in ordinary and concise language.   The allegation that the "defendant caused the plaintiff to slip through the open cage with no doors, and the said defendant thereby broke two bones in plaintiff's foot," is without substantiation in the testimony.   But we are of opinion that, from a reading of the entire complaint, a cause of action may be gathered.

For the reasons heretofore stated, however, the judgment and order appealed from are reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.