MONSON, ADMINISTRATRIX, APPELLANT, *v.* LA FRANCE COP-
PER CO., RESPONDENT.

(No. 2,933.)

(Submitted March 7, 1911.  Decided March 22, 1911.)

[114 Pac. 779.]

*Personal Injuries in Mines—Master and Servant—Assumption*
*of Risks—Instructions—New Trial—Discretion.*

New Trial—Affirmance of Order, When.
   1.   Where the district court in granting a new trial does so in an order
general in terms, its action will be affirmed if it can be justified upon
any one or more of the grounds assigned in the motion.

Same.
   2.   The supreme court will not interfere with an order granting a new
trial in a personal injury action, one ground of the motion for which
was insufficiency of the evidence to support the verdict in favor of
plaintiff, where the evidence was in direct conflict as to the cause of
the injury.  If the court under such conditions is dissatisfied with the
verdict it is its duty, in the exercise of its legal discretion, to grant a
retrial.

Personal Injuries—Assumption of Risk—Question for Court or Jury, When.
   3.   Where reasonable, fair-minded men might draw different conclu-
sions from the evidence as to whether a servant assumed the risk of
his employment, the question is properly one for the jury; if, however,
it furnishes ground for but one inference, the question is one of law
for the court's determination.

Same—Statutes—Violation by Master—Assumption of Risk—When Ques-
tion not Involved.
   4.   The defense of assumption of risk is available to the master even
though the negligence alleged was in violation of a duty imposed by
statute; where, however, at the time of the injury of plaintiff's intes-
tate he was so situated (in a deep mining shaft) as to have no choice
of means of egress other than that provided by the master, and in the
use of which he was killed (a mining cage from which the doors were
missing, contrary to the provisions of section 8536, Revised Codes), he
will be presumed to have submitted to its use from necessity, and
therefore not to have assumed the attendant risk.  The refusal of an
instruction on that defense, under such circumstances, was not error.

*Appeal from District Court, Silver Bow County; John B. Mc-*
*Clernan, Judge.*

ACTION by Sadie A. Monson, administratrix of John Monson,
deceased, against the La France Copper Company.  From an
order granting a new trial after judgment for plaintiff, she ap-
peals.  Affirmed.

43 Mont.—5

In behalf of Appellant, there was a brief by *Messrs. Breen & Hogevoll. Mr. H. K. Jones* argued the cause orally.

*Messrs. Gunn & Hall,* for Respondent, submitted a brief. *Mr. E. M. Hall* argued the cause orally.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

On former appeals in this cause the defendant was awarded a new trial on the ground that the evidence was insufficient to show that its negligence was the efficient cause of the death of Monson, plaintiff's intestate. (*Monson* v. *La France Copper Co.,* 39 Mont. 50, 133 Am. St. Rep. 549, 101 Pac. 243.) This trial, had upon the same pleadings, resulted in a judgment for plaintiff. The defendant thereupon moved for a new trial, alleging as grounds therefor insufficiency of the evidence to justify the verdict, and errors occurring during the trial by which defendant suffered prejudice. The court made a general order sustaining the motion. Plaintiff has appealed. Under [1] the rule uniformly observed by this court, the defendant is entitled to an affirmance of the order, if it can be justified upon any one or more of the grounds assigned in the motion. (*State* v. *Schnepel,* 23 Mont. 523, 59 Pac. 927; *Welch* v. *Nichols,* 41 Mont. 435, 110 Pac. 89.)

By reference to the statement in the opinion delivered on the former appeals, it will be found that the negligence alleged was the omission by the defendant of the duty imposed by the statute (Rev. Codes, sec. 8536) to equip properly, with doors or gates, a hoisting cage used by it in a vertical mining shaft, from which, by reason of the omission, Monson, who was employed as a pumpman, fell and was killed. The defenses upon which defendant relied were general denials and the affirmative defenses of contributory negligence and assumption of risk by Monson. The evidence adduced, while clearly establishing the omission of duty by the defendant and the death of Monson, was held insufficient to show that the former was the direct proximate cause of the latter. It appeared that the hoisting cage in

use by defendant was furnished with doors so adjusted that they could readily be taken from their hinges and set aside when not in use in raising or lowering men; that, when so used, the doors were manipulated by employees known as topmen and station tenders; that the superintendent, engineers and foremen, when engaged in inspection and similar duties, did not use the doors, but depended for safety upon the handbar, another device with which the cage was equipped; that Monson in going to the places to which his duties called him, though he was expected to do so, did not put on the doors even when plaintiff accompanied him, which she sometimes did with friends visiting the mine; that the topman was not present, and that Monson did not put on the doors on the evening of his death; that at his request the hoisting engineer lowered him to the 1,400-foot station about 11 o'clock in the evening, that being the hour for him to go on shift; that he had with him his lunch in a bucket; that the cage was then raised to the surface; that at a signal given by Monson, at or about 2 o'clock, the cage, still without doors, was returned to him to raise him to the 600-foot station, where he was to complete his work for the night; that by direction of Monson the cage was then set by the engineer at the latter station; that, having received no signal to take it away, the engineer sent men down another compartment to ascertain the cause of the delay; that at about sixty feet above the 1,400-foot station these men found the dead body of Monson lying with the head upon the shaft timbers on one side, the feet in the same position on the other, and the hips resting on or against a wall plate; that the face was bruised and cut, but that there were no broken bones nor evidence of other wounds; that there was no evidence that the wound on the face was mortal, and that the lunch bucket was found in the cage. So far, the evidence contained in the record now before us is substantially the same.

At the second trial other testimony was introduced for the purpose of showing how the death of Monson occurred, as follows:

The witness Holland testified: "I did not make any examination of his body on the surface, not more than handling it, put-

ting it back on the cage, and taking it to the surface, and taking it off there. In handling his body it appeared to be all broke up. The bones were broken; appeared that way by handling. * * * His face was pretty badly cut up, right through here [indicating] across the face and mouth. I am indicating a gash between his eyes and nose, and also the top of the head, the brain. I saw a gash around his mouth, too. I could not tell, as an ordinary citizen, whether the wounds I saw were fatal enough to cause his death.'' On the first trial he had said nothing about the head and shoulders being crushed. On cross-examination he admitted that the following testimony given by him at that time was correct: ''His [Monson's] face was all battered up and cut up. It was bruised and swollen and a good many cuts in it. I did not notice any broken bones. * * * There was blood just where he was resting is all I noticed. I did not observe any blood any farther down than that. He was found halfway between the 1,300 and 1,400-foot levels. I could not tell whether the bruises he had were caused by having fallen a distance, or whether they were caused by a squeeze. I did not examine the cage.''

Witness Richards: ''The shoulders and head were badly crushed. In fact, the head wasn't any thicker than that [illustrating by placing his hands together, palms inward] when I got it.''

Dr. McCarthy: ''I listened to the testimony of the two last witnesses, the testimony of Michael Holland and the testimony of the witness Richards, the undertaker. In my opinion, as a physician and surgeon, these wounds are sufficient to produce death.''

The testimony of defendant's witnesses is as follows:

Frank, the mine superintendent: ''I could see the head very plainly, and it was somewhat swollen. There was, as I remember it, a bad gash across the forehead, and another one, I think, across the face and cheek, extending through the lip. Aside from that, though, from the swelling and these gashes, it looked perfectly normal. It is absolutely not the case that the head was crushed as flat as a man's two hands. * * * My exam-

ination was from the east compartment. It was not with the
light of a candle. We had several torches, torches such as are
ordinarily used by shaftmen in the mine. * * * I had a
very close look at the body at the time I discovered its where-
abouts. I don't know what you mean by personal examination.
I didn't feel of the body, if that's what you mean, and I didn't
lift it, or anything of that sort; but the head was as close to me
as about two feet, less than two feet. As a matter of fact, I am
not sure which eye there was a gash over. I know there was a
diagonal gash across the forehead, and another one on the face.
That one went through the mouth. I didn't remove his clothes
or make any examination of the shoulders to see whether they
had been crushed. I made no physical examination of the head
to see if that had been crushed, but I could see the head lying
there in its perfectly normal shape, except for these two bruises
on the face and forehead; but any statement as to its being
flattened to the thickness of a man's two hands was absolutely at
variance with my observations.''

Orem, the deputy state mine inspector: ''I noticed the head,
but nothing particularly; looked to be swollen to me. As to the
head being crushed as flat as an ordinary man's two hands, it
wasn't that way when I saw it.'' On cross-examination he
stated: ''I made no physical examination. The man was dead.
I noticed a scarred and cut-up head and face, and made no fur-
ther examination, and didn't view the body again. I did not
examine under his clothes to see what condition his shoulders
were in.''

It appeared from the testimony of these witnesses that the
lunch bucket was overturned, and that the food it had contained
was scattered about the deck of the cage. Incidentally it also
appeared that there were a few men at work on the 200-foot level
of the mine, and that these and Monson were the only employees
in the mine on that shift. The wounds upon Monson's body,
as described by Holland and Richards, would indicate even to a
layman that he had been killed either by violence of a fall, or
that he had in some way been caught between the cage and the
timbers, and crushed to death. The defendant's witnesses, while

admitting that the face and head were bruised, deny that the head was crushed, and render it questionable whether the bones in the body were broken. In view of the contradictory statements made by Holland, the credit to be accorded to his testimony was exclusively for the jury to determine. So, also, in considering the description given by Richards as to the condition of the head, we find it in direct conflict with that given by defendant's witnesses. A jury might conclude that Richards' statement in this behalf was not true, and hence that his whole story was false. The opinion of Dr. McCarthy was based upon all the wounds described by Holland and Richards, and is of no value if their statements be disregarded. He expressed no opinion as to the fatal character of the wounds upon the face and head; so that, if the evidence of Holland and Richards be eliminated, there is no evidence upon which the cause of the death can be found other than what was before us on the former appeals. This we held was not sufficient to warrant the conclusion that the negligence of defendant was the efficient cause of the death. Therefore, upon any view of the evidence, it was clearly a question for the jury whether the death of Monson was the result of a fall from the cage by reason of the absence of the [2] doors. If under this condition of the evidence the trial court was not satisfied with the verdict, it was its duty, in the exercise of its legal discretion, to grant the defendant a new trial, and with its action this court may not interfere. (*Haggin v. Saile,* 14 Mont. 79, 35 Pac. 514; *Murray v. Heinze,* 17 Mont. 353, 42 Pac. 1057, 43 Pac. 714; *Welch v. Nichols, supra.*) In view of the contentions made by counsel, we have not deemed it incumbent upon us to determine the question whether the evidence as a whole would sustain a verdict for plaintiff. Counsel on both sides have proceeded upon the assumption that it would. We have not considered this question, and, since there must be another trial, refrain from expressing any opinion upon it.

The foregoing discussion disposes of this appeal. Counsel for defendant insist, however, that it was entitled to a new trial as a matter of right, because the court refused to submit to the jury any instruction upon the defense of assumption of risk. This

[4]   defense is available to the master, even though, as in this case, the negligence alleged is in violation of a duty imposed by statute (*Osterholm* v. *Boston & Mont. C. C. & S. Min Co.*, 40 Mont. 508, 107 Pac. 499), and the question whether or not the injured servant did in fact assume the risk is ordinarily for the jury to determine.   This is always the case when the evidence [3]   is in such a condition that reasonable, fair-minded men might draw different conclusions from it.   (*Anderson* v. *Northern Pac. Ry. Co.*, 34 Mont. 181, 85 Pac. 884; *Osterholm* v. *Boston & Mont. C. C. & S. Min. Co.*, *supra.*)   When it furnishes ground for but one inference, however, it presents a question of law for determination by the court.

The duty imposed by the statute is a continuing one.   The master engaged in mining as was defendant here is bound to have his cages equipped with doors whenever men are being moved in them, whether up or down.   If the employee about to be carried has his choice to continue in the employment or to abandon it when the master habitually omits use of the statutory safeguards, or if upon a particular occasion, on a like omission, he may submit to being carried or not, as he chooses, then it becomes a question whether he knows and appreciates the danger [4]   to which he exposes himself.   But, if at the time he is so situated that he has no choice, it may be presumed that he submits from necessity, and therefore does not assume the attendant risk.   It might be a question whether Monson assumed the risk in using the cage when he went to his work, because he knew that the topman was not present, and that it was a part of his duty to put the doors in place.   When the peril incident to the use of it at that time was ended, he had reached the place of duty, whence he could not escape except by such means as the master furnished him.   So far as appears from the record before us, communication with the surface, except to control the movement of the cage by signal, was cut off.   He had no choice.   He must either stay there indefinitely, or use the cage as it was when sent to him.   Under these circumstances, we think the question whether he assumed the risk of the danger brought about by the

defendant's omission of its continuing duty was not involved. and that the instruction upon this subject was properly refused.

In the *Osterholm Case* there was a difference of opinion as to whether it was safer to use the doors while the work of cutting stations was being prosecuted. The manager of the mine was of the opinion, not only that it was safer to use the cage without the doors while prosecuting this work, but also that this was a part of the work of sinking, and hence that the statute imposed no duty to use the doors. In view of this fact, and the additional fact that the plaintiff might well have entertained the same opinion, and hence. acted of his own choice, it was held that the question whether he assumed the risk should have been submitted to the jury. The circumstances shown by the evidence in this case do not fall within the principle of that case.

The order is affirmed.

*Affirmed.*

MR. JUSTICE SMITH and MR. JUSTICE HOLLOWAY concur.