FOTHERINGILL, APPELLANT, *v.* WASHOE COPPER CO. ET AL., RESPONDENTS.

(No. 2,946.)

(Submitted June 8, 1911. Decided June 22, 1911.)

[117 Pac. 86.]

*Personal Injuries—Master and Servant—Assumption of Risk— Evidence—Sufficiency.*

Personal Injuries—Master and Servant—Assumption of Risk.
  1. A servant assumes all the usual and ordinary risks attendant upon his employment, not including risks arising from negligence of the master, and he assumes the latter as well if he knows of the defects

from which they arise and appreciates the dangers which flow from such defects.

Same—Assumption of Risk—Knowledge by Servant.

2.   Where an experienced miner agreed to take the coal from a mine, defendant to do · the timbering, and, by the method of timbering adopted, the timbers were brought up within about four feet of the coal, and because of the nature of the roof between the timbers and the coal the danger from falling rock was serious, and plaintiff knew this and commented on it, and knew the means and feasibility of another method of timbering by "forepoling" the space between the other timbers and the coal, and urged defendant to do this, but continued to work, without promise on defendant's part that different methods would be adopted, there was an assumption of risk.

Same—Assumption of Risk—Nature of Defense.

3.   The defense of assumption of risk is not founded in contract, and may be interposed against a servant, not because he agreed, but because it is a part of the law which can only be abrogated by the legislature.

Same—Evidence—Sufficiency.

4.   Evidence *held* to show that the master did not hold out assurance that a different method of timbering a mine would be adopted, relieving the servant of assumption of risk.

*Appeal from District Court, Carbon County; Sydney Fox, Judge.*

Action by R. Fotheringill against the Washoe Copper Company and another. From a judgment for defendants and an order denying him a new trial, plaintiff appeals. Affirmed.

*Messrs. Walsh & Nolan* submitted a brief in behalf of Appellant. *Mr. T. J. Walsh* argued the cause orally.

The general doctrine of assumption of risk as it involves risks arising from the negligence of the master himself, one who multiplies the dangers of hazardous occupations by the reckless manner in which he conducts his business, is the subject of the severest criticism by enlightened modern law-writers. (See 1 Labatt on Master and Servant, 65; *Richmond etc. Ry. Co.* v. *Norment,* 84 Va. 167, 10 Am. St. Rep. 827, 4 S. E. 211.) Hence it is not surprising that the judicial mind has occasionally exhibited a disposition to mitigate its harshness and to increase the burden of establishing the defense involving it.

As the rule is commonly stated it is to the effect that the servant assumes all the usual and ordinary risks attendant upon his employment, not including risks arising from the negligence of the master, and that he assumes the latter as well, if he knows of

the defects from which they arise and appreciates the dangers which flow from such defects. In the development of this branch of the law, knowledge of a defect was originally held sufficient to bar a recovery and the servant was held to know of defects which he could have discovered by the exercise of reasonable diligence. But it was justly held, after a time, that knowledge of a defect, unless it was accompanied by an appreciation of the danger arising from it, ought not to preclude recovery by the servant. (*Cook* v. *St. Paul etc. Ry. Co.*, 34 Minn. 45, 24 N. W. 311.)

Then it was pointed out that the servant ought not to be held under any obligation to make any kind of a search to ascertain whether the master has or has not fulfilled his duty, and that an instruction which relieves the master from liability if the servant could have discovered the defect by the exercise of reasonable diligence is erroneous. (*Choctaw* v. *McDade*, 191 U. S. 64, 24 Sup. Ct. 24, 48 L. Ed. 96.) Of course, if a defect is open and obvious the servant must be deemed to have known of it.

As the doctrine is subjected to judicial analysis, another feature of it, long accepted without question, is being held untenable, namely, that when it appears that the servant knew of the defect and appreciated the peril, he is to be deemed as a matter of law to have assumed the risk. Just why the servant should be conclusively held impliedly to have taken the risk, instead of the master, or why either should be deemed to have assumed it as a matter of law, is the question to which the minds of judges not willing to accept formulas simply because they are old are being addressed.

Suppose that one of defendant's men, becoming alarmed at the conditions, calls the manager into the drift and shows him the evidences of danger, in consequence of which he assumes for his company the risk of injury to the employee. Unquestionably the employee would not assume the risk under such conditions. He would be entitled to recover though he knew of the defect and appreciated the danger. (1 Labatt on Master and Servant, 379.) It is assumed, of course, that the danger was not so imminent and obvious as that no prudent man would subject him-

self to any such risk. In that case the servant would be guilty of contributory negligence and probably the special contract in form entered into would be void.

On the other hand, imagine the employee discovering the defect and calling the attention of the master to it, and the latter saying, "Well, I think your fears are groundless. Anyway, I shall do nothing to make the place any more secure. You may either continue at work and take the risk or quit, as you please." In that case the servant, whether he expressly declares that he will take the risk or returns to his work upon such an unequivocal declaration, without comment, must of course be held to have accepted the terms proposed. Either his declaration or his act would establish conclusively that he accepted the risk.

But now we reach the case where neither says anything. Each knows the conditions. Each appreciates or ought to appreciate the danger. But nothing whatever is said. Let it be kept in mind that the danger arises from neglect of the master, from omission to do something he ought to do to preserve the lives of his employees. Why should it be assumed in such a case that his servants in effect said to him, "We are working in a dangerous place. We know it. But we feel that if we complain you will refuse to make the repairs needed and we prefer to take the chances rather than quit?" Why should that be assumed rather than that he said, "You are working in a dangerous place; you know it and I know it. It is dangerous because I have omitted to do something which I should have done. But if you continue working, I will assume all risk of your being injured by reason of my failure to take the precautions we recognize I have failed to take." Why is it not, whenever there is not a perfectly unequivocal agreement between the parties as to which one is to take the risk, a question for the jury to say which one actually did? Such is the unquestioned rule in England to-day. (See 1 Labatt on Master and Servant, 376.)

While undoubtedly innumerable cases may be found in which knowledge of the defect and appreciation of the danger have been declared to bar recovery, it is obvious that the trend of judicial thought is away from this indefensible position to the

only logical stand: that taken by the house of lords in *Smith* v. *Baker,* [1891] App. Cas. 325, referred to by Mr. Labatt.

The supreme court of North Carolina, speaking of a remark of Lord Lindley in *Yarmouth* v. *France,* 19 Q. B. D. 647, in which the rule of *Smith* v. *Baker* was reaffirmed, said: ''This has the weight of practical common sense, no matter from what court it comes.'' (*Lloyd* v. *Hanes,* 126 N. C. 359, 35 S. E. 611, per Clark, J.) The supreme court of Arkansas declares the English doctrine to be ''logically sound'' (*Choctaw O. & G. R. Co.* v. *Jones,* 77 Ark. 367, 92 S. W. 244, 4 L. R. A., n. s., 837, 7 Ann. Cas. 430), and it was commended by the supreme court of Massachusetts in *Mahoney* v. *Dore,* 155 Mass. 513, 30 N. E. 366, while *Smith* v. *Baker* was cited in support of the conclusion arrived at by that eminent court in *Wagner* v. *Boston El. Ry. Co.,* 188 Mass. 437, 74 N. E. 919, and in *Barrett* v. *New England T. & T. Co.,* 201 Mass. 117, 87 N. E. 565.

The very gist of the doctrine of the English cases was expressed in the opinion in the last-cited case in these words: ''In order to constitute an assumption of risk, it must appear not only that the person who is alleged to have assumed it knew of it but also that he appreciated and voluntarily assumed it.'' Note the requirements: Not only must it appear that he knew and appreciated the risk, but also that he assumed it. (See, also, *Jellow* v. *Fore River S. Co.,* 201 Mass. 464, 87 N. E. 906; Dresser's Employer's Liability, sec. 114; 1 Shearman & Redfield on Negligence, 211; *Hamilton* v. *Mining Co.,* 108 Mo. 364, 18 S. W. 977; *Francis* v. *Kansas City etc. Ry. Co.,* 127 Mo. 658, 30 S. W. 129, 28 S. W. 842; *Northern Pac. Ry. Co.* v. *Mares,* 123 U. S. 710, 8 Sup. Ct. 321, 31 L. Ed. 296; *O'Mellia* v. *Kansas City etc. R. R. Co.,* 115 Mo. 205, 21 S. W. 503.)

While some of the cases above referred to relate to the risk attendant upon the use of defective appliances and working with incompetent fellow-servants, the same rule is applied in cases involving the law of a safe place. (*Mahaney* v. *St. Louis etc. Ry. Co.,* 108 Mo. 191, 18 S. W. 895.) The doctrine of these cases has become the settled law of the state of Missouri. (*Dodge* v. *M. C. & C. Co.,* 115 Mo. App. 501, 91 S. W. 1007;

*Robertson* v. *Hammond Pack, Co.*, 115 Mo. App. 520, 91 S. W. 161.) The last-mentioned case is closely analogous to the one at bar, and fully justifies a reversal of the judgment here appealed from. The doctrine of these cases was followed and approved by the supreme court of Illinois in *Hartrich* v. *Hawes*, 202 Ill. 334, 67 N. E. 13. (See, also, *Graham* v. *Newburg Orrel Coal & Coke Co.*, 38 W. Va. 273, 18 S. E. 586.) Minnesota has lately come in line also in support of the more logical doctrine. (*Rase* v. *Minneapolis etc. Ry. Co.*, 107 Minn. 260, 120 N. W. 360, 21 L. R. A., n. s., 138.)

Without regard, however, to the conclusion that may be reached as to the soundness of the views heretofore in this brief exploited, there is perfect unanimity in the decisions to the effect that the appellant had a right to rely upon the assurance given him by Good, that the roof was safe without the forepoles and that he would attend to whatever timbering was necessary. The primary duty of the appellant was obedience, and he was not expected nor permitted to set up his judgment or opinion against the direction of the master. (*Harrison* v. *D. & R. G.*, 7 Utah, 523, 27 Pac. 728.) Moreover, he was entitled to rely on the supposedly superior knowledge of his master. (*Shortel* v. *City*, 104 Mo. 114, 24 Am. St. Rep. 317, and note, 16 S. W. 397.)

In behalf of Respondents, *Messrs. C. F. Kelley, L. O. Evans,* and *D. Gay Stivers* submitted a brief. *Mr. Stivers* argued the cause orally.

The facts alleged in the complaint fairly support the conclusion that appellant assumed the risks of the business in which he was employed; and if his service had been rendered extrahazardous, he must, in his complaint, aver facts showing that the dangers which augmented the risks of his services were not known to him. (*Schroder* v. *Montana Iron Works*, 38 Mont. 474, 100 Pac. 619; Wood on Master and Servant, par. 414; *Dixon* v. *Western Union Tel. Co.*, 68 Fed. 630; *Mad River & Lake Erie R. R. Co.* v. *Barber*, 5 Ohio St. 541, 67 Am. Dec. 312; *Tennis Co.* v. *Davis* (Ind. App.), 92 N. E. 986; *Malone* v. *Hawley*, 46 Cal.

409; *Fortin* v. *Manville Co.,* 128 Fed. 642; *Brainard* v. *Van Dyke,* 71 Vt. 359, 45 Atl. 758; *Cleveland C. C. & St. L. Co.* v. *Lindsay,* 33 Ind. App. 404, 70 N. E. 283, 998; *Chicago & Bloomington Stone Co.* v. *Nelson,* 32 Ind. App. 355, 69 N. E. 705; *Brazil Block Coal Co.* v. *Young,* 117 Ind. 520, 20 N. E. 423; *Peerless Stone Co.* v. *Wray,* 143 Ind. 574, 42 N. E. 927.) It is true the complaint alleges that the appellant was without fault or negligence on his part; but this is insufficient to supply the want of allegation that appellant did not know of the dangerous condition. (*New Kentucky Coal Co.* v. *Albani,* 12 Ind. App. 497, 40 N. E. 702.)

In the case last cited it is held that where a recovery is sought for the master's neglect of his duty, with reference to safe place or appliances, knowledge of the defect by the master, and want of knowledge by the servant, must be affirmatively shown by the complaint. The servant's knowledge or want of knowledge must be specially alleged, because upon this it depends whether or not he is to be held to have assumed the risk of the defect. It is also established by the authorities that the allegation as to knowledge includes not only actual, but constructive, knowledge. (*Coal Co.* v. *Barth,* 5 Ind. App. 159, 31 N. E. 585; *Manufacturing Co.* v. *Fields,* 138 Ind. 58, 36 N. E. 529; *Chicago etc. Car Co.* v. *Norman,* 49 Ohio St. 598, 32 N. E. 857; *Allen* v. *Augusta Factory,* 82 Ga. 76, 8 S. E. 68; *Louisville etc. Ry. Co.* v. *Sanford,* 117 Ind. 265, 19 N. E. 770; *Daugherty* v. *Midland etc.,* 23 Ind. App. 78, 53 N. E. 844; *Kentucky & I. Bridge Co.* v. *Eastman,* 7 Ind. App. 514, 34 N. E. 835; *Chicago & E. R. Co.* v. *Lee,* 17 Ind. App. 215, 46 N. E. 543.)

A servant is conclusively presumed to have assumed the ordinary risks of the employment. (Rev. Codes, sec. 5243.) This is incidental to his employment. Beyond this he does not assume any risk except by express agreement, or where the circumstances are such that he must be presumed to have done so from the fact that he continued in the employment, though the extraordinary danger was known to him, or was so obvious that he must be presumed to have had knowledge of it. (*Schroder* v.

*Montana Iron Works,* 38 Mont. 474, 100 Pac. 619; *Coulter* v. *Union Laundry Co.,* 34 Mont. 590, 87 Pac. 973; *Hollingsworth* v. *Davis-Daly Estates Copper Co.,* 38 Mont. 143, 99 Pac. 142.) It is also the rule that the servant, upon entering the service, assumes the risks and perils incident to the employment, so far as such risks and perils are open, apparent and discernible by a person of his age and capacity, in the exercise of reasonable care for his own safety. (*Anderson* v. *Northern Pacific Ry. Co.,* 34 Mont. 181, 85 Pac. 884.)

The authorities hold that the plaintiff is to be held as having assumed the ordinary risks of the business, but not any extraordinary risks, unless it appear that he was aware of such at the time of his employment, or that upon learning of their existence he continued in the employment after the lapse of a reasonable time for the defects to be remedied or removed. (*McCabe* v. *Montana Central Ry. Co.,* 30 Mont. 323, 76 Pac. 701; *McAndrews* v. *Montana Union Ry. Co.,* 15 Mont. 290, 39 Pac. 85; Labatt on Master and Servant, secs. 259, 270, 271 *et seq.*)

In the case of *Gregory* v. *C., M. & St. P. Ry. Co.,* 42 Mont. 551, 113 Pac. 1123, decided by the supreme court of Montana, February 12, 1911, it is laid down as a rule that while the servant may assume that the master has performed his duty fully, and that he will not be exposed to any *hidden* danger, yet he assumes the risks that are open and obvious to him when they arise from the business in which he is engaged; for they are risks which he is hired to assume. (*Crown Coal & Tow Co.* v. *Koenig,* 119 Ill. App. 192; 1 Current Law, 10; *Gibson* v. *Erie Ry. Co.,* 63 N. Y. 452, 20 Am. Rep. 552; *Clarke* v. *Holmes,* 7 Harb. & N. 937.)

Appellant and his fellow-servant Batten were contract pick-miners; they were not ordered into this place by the superintendent, and if they did not want to work there, they could have abandoned their contract. In other words, appellant freely accepted the contract, went to work in this place with full knowledge of all of the conditions, and of what was necessary to obviate the danger, knowing full well what had been and what had not been done to protect the place; that he himself, two days previous had fired off a blast which had shattered and shaken

the coal and roof; and we contend that his actions constituted negligence for which these respondents are not responsible, even though it might be found that respondents were negligent in the discharge of the duties which they owed to him. (20 Am. & Eng. Ency. of Law, 145; *Martin* v. *Baltimore & O. Ry. Co.*, 41 Fed. 125; Labatt on Master and Servant, sec. 334; *Atchison, T. & S. F. Ry. Co.* v. *Tindall*, 57 Kan. 719, 48 Pac. 12; *Coyle* v. *Pittsburg etc. Ry. Co.*, 155 Ind. 429, 58 N. E. 546.) If plaintiff was guilty of any negligence, however slight, he cannot recover. (*Rydell* v. *Greenhut & Co.*, 140 App. Div. 926, 125 N. Y. Supp. 838.)

The case before the court falls within the doctrine announced in a long line of decisions, that where the danger of the work is obvious and known to the servant (especially where he is of mature years and average experience), he assumes the risk whether the master has assured him that the work is safe or has told him that he would not repair or do anything further to make it safe. (*Anderson* v. *Akeley Lumber Co.*, 47 Minn. 128, 49 N. W. 664; *Fort Worth Iron Works* v. *Stokes*, 31 Tex. Civ. App. 218, 76 S. W. 231; *Weigreffe* v. *Daw*, 40 Ill. App. 53; *Showalter* v. *Fairbanks Co.*, 88 Wis. 376, 60 N. W. 257; *Toomey* v. *Eureka Iron & Steel Works*, 89 Mich. 249, 50 N. W. 850.) If the servant undertakes or continues in the performance of work, the danger of which he fully comprehends, the fact that he undertakes it unwillingly, and for fear of losing his employment, will not relieve him of the assumption of the risk incident thereto. (*Monson* v. *La France Cop. Co.* (Mont.), 114 Pac. 778.) In the light of all of the surrounding circumstances, and of his admissions on the stand, it is certain that plaintiff appreciated the danger. (*Stephens* v. *Elliott*, 36 Mont. 92, 92 Pac. 45; *Forquer* v. *Slater Brick Co.*, 37 Mont. 436, 97 Pac. 843; *Hardesty* v. *Largey Lumber Co.*, 34 Mont. 151, 86 Pac. 29; *O'Brien* v. *Corra, R. I. & P. Co.*, 40 Mont. 212, 105 Pac. 724; *Osterholm* v. *B. & M. Co.*, 40 Mont. 508, 107 Pac. 499; *Thurman* v. *Pittsburg & Mont. Copper Co.*, 41 Mont. 141, 108 Pac. 588.) He formed a judgment as to the future, and his judgment unfortunately was right.

(*Stewart* v. *Pittsburg & Mont. C. Co.*, 42 Mont. 200, 111 Pac. 723.)

If plaintiff intended to rely upon a promise to repair, or other assurance of safety, he should have pleaded it. (*Daugherty* v. *Midland Steel Co.*, 23 Ind. App. 78, 53 N. E. 844; *Car Co.* v. *Norman*, 49 Ohio St. 598, 32 N. E. 857; *Harris* v. *Bottum*, 81 Vt. 346, 70 Atl. 560; *Missouri Pac. R. Co.* v. *Baxter*, 42 Neb. 793, 60 N. W. 1044; *Malm* v. *Thelin*, 47 Neb. 686, 66 N. W. 650; *Burns* v. *Windfall Mfg. Co.*, 146 Ind. 261, 45 N. E. 188; *Consolidated Coal Co. of St. Louis* v. *Bokamp*, 181 Ill. 9, 54 N. E. 567; *Bogenschutz* v. *Smith*, 84 Ky. 330, 1 S. W. 578; *Railroad Co.* v. *Doyle*, 49 Tex. 190; *Louisville etc. Ry. Co.* v. *Sandford*, 117 Ind. 265, 19 N. E. 770; *Hayden* v. *Manufacturing Co.*, 29 Conn. 548; *Stephenson* v. *Duncan*, 73 Wis. 404, 9 Am. St. Rep. 806, 41 N. W. 337.)

MR. JUSTICE SMITH delivered the opinion of the court.

Plaintiff commenced this action in the district court of Carbon county to recover damages alleged to have been sustained by reason of the failure of the defendant company to sufficiently timber an entry in a coal mine in which he was working as its employee. A rock fell upon him from the roof of the entry and injured him. It appears from his testimony that he and three other miners had been mining coal by the day and doing such timbering as they were ordered to do. The defendant Good had full charge of the mine. Plaintiff was a man about thirty-two years of age, who had mined coal for twenty years. Sometime in February, 1909, he and his three companions agreed with Good to take out the coal by contract. He then said to Good: "How would it be to give us figures on the timbering?" Good replied: "Never you mind about the timbering; we will take care of the timbers. You dig the coal out, and we will attend to the rest." Plaintiff testified: "The only agreement we came to in relation to the timbering was that they were to do it. I agreed to do the work at the schedule price. I went to work under that arrangement, until the eleventh day when I got hurt. The company

men timbered up behind us. We had nothing to do with the timbering, and didn't get tools for that. That ground was a limestone formation and quite a number of pot-holes in it. Pot-holes sometimes are perfectly round and the small end up; the big part will be down even with the surface of the coal. In the progress of our work, as we were running an entry along there, rock had been falling all the way from those pot-holes from the time we started the coal away from the slope. Sometimes it would come down pretty close behind us. We could never tell anything about when it was coming down; always had to keep sounding it and feeling it, as we had to be very cautious with it. It was continuously falling all along the slope from the time the coal started in the slope even to the time I met with the accident. The stuff that comes from the pot-holes, some of it is rock, and some of it is sulphur balls, and other a little coal intermixed with the different substances. When the timbers were put in, these pot-holes dropped on top of them, when they weren't lagged up. They would settle on these timbers, but the fall would be stopped where the timbers were installed. We never get a set of timbers up within four feet of the face, I dare say—that is to say, the last set of timbers would be a distance of four feet from the breast, or more; there was nothing at all to support the roof between this last set of timbers and the breast. There was more or less danger, in working in the breast, of one of these pot-holes dropping down on us. I spoke to Mr. Good about it, had different conversations with him, while we were working in this specified entry. When he came, I says, 'Tom, don't you think it would be better if they would use forepoles on these timbers to protect us in the face?' I can illustrate what forepoles are. They generally would put lagging on the slabs that would run from the center of one set of timbers to the center of the other; then I suggested that he go to work and put forepoles on—that is, extending the end of the timbers. I have been familiar with that system of timbering in different places. It is made use of in bad ground in any place where it is liable to come down during the time the men are at work; supposed to be put there for their protection. When I asked Mr. Good suggest-

ing the method of protecting ourselves, he said he would see to the timbers, or it wasn't necessary; that is all we ever got out of him—never got any forepoles in at all. The morning of March 22d I went to work; went in as usual and felt the place to see how it sounded, and sounded the roof; pulled down what coal was necessary off the face. I felt everything, sounded everything. I took my pick and started to work on the face. I put my hand up against the roof, sounded the roof; it sounded good, like all pot-holes do. It was as smooth as a table here; couldn't tell whether there was anything there that would come down or not. After I started to work, the pot-holes came down and caught me at the time I was engaged in digging coal in the breast. It fell from the face halfway over to the set of timbers. It was four feet eight or ten inches from the last set of timbers to the breast. I believe it was five feet from one set of timbers on the other side, I would not be right positive. I have mined a long time. I know how to take coal out of an entry. I understood digging coal. I cannot answer as to whether I know as much about taking this coal out as Mr. Good, because I don't know his ability. I suppose I am as well acquainted as anybody else with the same mining experience digging coal out of an entry. I have had twenty years' experience in looking out for the roof, protecting myself in entries with timbers. I always did protect myself. I consider myself qualified by my experience to do so. This last set of timbers did not meet with my approval. I knew it right along. I stated the fact to Mr. Good. It wasn't blocked as it should have been on top, or forepoles put in, as I stated. In those two respects it was imperfect. I knew it right along on Saturday, and Monday morning (the 22d) when I went to work. I talked with Good about the timbering at different times. We had sounded the roof there, that is how we came to tell Mr. Good it was bad. The entry was timbered from the face to within four feet eight inches of where I was hurt. The Saturday before I got hurt there was a rock fell through and struck back behind and hit one of the timbermen. We were supposed to sound our roof, which we done, ahead of this last set of timbers, to find out whether the ground was safe to work

in. We sounded the roof whenever we thought it was neces-
sary. Lots of times we didn't think it needed sounding, but
we sounded it merely to protect ourselves. In regard to pro-
tecting ourselves, we were supposed to take out the coal and
sound the roof; that was our duty, and the company was sup-
posed to do the timbering. There was no other agreement made
at all. There is no miner living that can tell the condition of
pot-holes. If we found a place there that sounded drummy and
bad we had to wait until the company came and put in a set of
timbers. On the Monday morning while I was working there
was no room for a set of timbers on one side; these sets are all
put up square. I knew from the time we started that this place
where we were working ahead of the last set was more than
ordinarily dangerous, from the time the coal was taken from
the slope on in, it was more or less dangerous. I certainly
understand coal mining is a dangerous occupation, and I realized
my place was more than ordinarily dangerous. I appreciated
the existence of that danger. I knew this place I was working
in, ahead of these timbers, should be protected more than it had
been. I put in the last blast there before the accident; my part-
ner and I. I understood my working place was the space of the
entry, ahead of the timbers. On the morning of the 22d of
March when I was hurt I was telling Dave Batten, my partner,
that they should put that forepoles on and fix the place. I told
him that it would be better if he went to work and put these fore-
poles on; it would accomplish more protecting, in that nature of
a place. I had realized all the way through that there should
have been pole lagging extending over it. I told the timbermen
different times that they should operate the system for that kind
of ground I have already mentioned. I never thought that the
way they put in the timbers was right when I started. The
feature about this work that made it more than ordinarily dan-
gerous was the nature of the ground; the limestone nature of
that ground over there, more or less pot-holes in it. If I hadn't
worked there, after I found that the ground was more dangerous
than ordinary, after having these talks with Good, I would have

43 Mont.—32

had to get out; it was one or the other, get out or work there. We were digging the coal out preparing a place for the timbers. Where this rock fell there was no room ahead for a full set of timbers." The record shows that the plaintiff here offered to prove that having asked the superintendent Good "whether pole lagging (?), that it was not necessary, he continued at work, feeling that the judgment of Good as to the safety of the place and the sufficiency of the timbering was rather to be relied upon than his own, and subordinated his judgment to that of his superior." The court sustained an objection to the offer.

Batten testified: "Pot-hole ground is very treacherous ground. I knew it was there because we had plenty of them coming down on us as we were doing the work. I heard Fotheringill asking Mr. Good about that—the roof was pretty bad, and he ought to forepole it. Mr. Good said he thought the ground didn't need forepoling. I knew the roof was dangerous. Fotheringill and I had examined the roof just before the accident, and I told him to look out for the roof, over the side of the entry, where he was working, as it looked unsafe to me, but he thought it was all right."

When the plaintiff rested his case the defendants moved for a nonsuit on several grounds, two of which were as follows:

"(10) For the reason that it affirmatively appears that plaintiff was an experienced miner, and well knew all of the risks and dangers incident to his employment, and voluntarily assumed all of the same, and he cannot now hold these defendants, or either of them, responsible or accountable for the injuries whereof he complains.

"(11) For the reason that it affirmatively appears that the plaintiff well knew of the dangers incidental to his employment as they existed in said entry and to the roof thereof, in the condition in which the same were at the time he went to work upon the day he was injured, and that he continued to work therein after such full knowledge, and voluntarily assumed whatever risks were incident thereto." The court sustained the motion and entered judgment for the defendants, from which judgment the plaintiff has appealed.

It is contended in the brief of the respondents that the record contains no evidence of negligence on their part. On the other hand, the appellant's counsel say: "We assume the master to be negligent." We shall not assume the master to have been negligent as a matter of law, but we may assume that the question of its negligence was one of fact for the jury, which might have been answered in the affirmative. The result is the same. Assuming that the jury might have found the company guilty of negligence in failing to forepole, was the district court justified in holding, as a matter of law, that the plaintiff assumed the risk of being injured on account of the lack of forepoling? ·

The learned counsel for the appellant says in his brief: "It is acknowledged at the outset that if the doctrine of assumption of risk is to be applied in all its harshness, unrestrictedly, as it has sometimes and by some courts been announced, there may be no right of recovery here." And again: "As the rule is commonly stated, it is to the effect that the servant assumes all the [1] usual and ordinary risks attendant upon his employment, not including risks arising from the negligence of the master, and that he assumes the latter as well, if he knows of the defects from which they arise and appreciates the dangers which flow from such defects." This is, indeed, the rule of law relating to assumed risks which the learned counsel assisted the district court and this court in framing and promulgating in the case of *Coulter* v. *Union Laundry Co.*, 34 Mont. 590, 87 Pac. 973. Here, as there, there is not any point made that the defendant company, upon being notified of the defect and danger, promised that it should be remedied. On the contrary, Good refused to forepole, saying that he did not consider it necessary. If there were anything in the record to indicate that plaintiff had any doubt on that point, many of the cases cited by the appellant might, perhaps, be in point. But there is not anything. His testimony shows that he considered forepoling necessary for some time prior to the accident. It is difficult to see how a stronger case of knowledge of defect and appreciation of danger could be made out. Fotheringill was repeatedly given to understand by [2] Good that the company proposed to continue mining with-

out the use of forepoles; and, with knowledge that his work was extraordinarily dangerous on account of a condition which he constantly had in mind, he continued his employment. Pot-holes and pot-rocks were constantly falling about him. The case cannot be distinguished from the *Coulter Case* in principle, unless it be that it is a clearer case of appreciation of danger than was disclosed in that action. As was said in *Osterholm* v. *Boston etc. Min. Co.,* 40 Mont. 508, 107 Pac. 499, the defense of assumption of risk is based upon an old and well-established principle of the common law, and has its foundation in the maxim, "*Volenti non fit injuria;* he who consents to an act is not injured by it." But it is argued that the maxim, being interpreted, raises the inquiry whether the servant impliedly agreed to take the risk. Not so. The consent referred to is consent to the act, not to the results flowing from the act. Having consented to the act, the law declares that he is not wronged by it, or, in other words, that he will be deemed to have assumed whatever risk may have been connected with a situation the dangerous character of which he understood and appreciated. The defense of assumption of risk is not founded in contract. It may be interposed against a [3] servant, not because he agreed that it might be, but because the law says it may. (*Osterholm* v. *Boston etc. Min. Co., supra.*) It is not within the power of this court to abolish or amend the defense. It is a part of the law of the land and must be abrogated, if at all, by the law-making power. In jurisdictions wherein it is held that the defense is founded in contract, the situation is altogether different. In such jurisdictions it may be, and doubtless is, proper in many cases to submit to the jury the question, Which party intended to assume the risk? But such a rule cannot be laid down by the courts in this jurisdiction. It is beyond their powers. We have, however, as we think is evidenced by the holding in the *Osterholm Case, supra,* been very careful to safeguard the rights of employees in cases where there can be any reasonable question whether they appreciated the risks arising from the physical conditions surrounding them.

As to the instant cause, we are of opinion that it falls squarely within the conditions of a supposed case set forth on pages 14

and 15 of appellant's brief, which counsel admit would not warwant the court in submitting the question to a jury.   Nor can we agree that the cause should have been submitted on the theory that appellant had a right to rely upon any assurances given him by Good.   His testimony shows beyond question that he had formed his own judgment as to the safety of the place.   He said he knew nothing of Good's ability.   There is not anything to warrant the conclusion that Good held out any assurance that the entry ahead of the last set of timbers would be forepoled.   There is but one conclusion which any reasonable man can draw from [4]   the testimony, and that is that Fotheringill believed that forepoles were required and Good did not; but in view of his other testimony, plaintiff would simply have stultified himself had he testified that he relied on any assurances of Good.   In remaining at work he acted advisedly, in the exercise of his own experienced judgment.   His testimony so discloses.   There was no uncertainty as to the menace of the situation.   The danger was continuous, obvious and notorious, and he fully appreciated it.   He relied upon his ability and experience for protection as he had done in the past.

The judgment is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.