MILFORD E. STREETER, Appellant, *vs.* THE WESTERN
WHEELED SCRAPER COMPANY, Appellee.

*Opinion filed April 18, 1912—Rehearing denied June 6, 1912.*

1. MASTER AND SERVANT—*duty to enclose dangerous machinery
not dependent on notice from factory inspector.* Section 1 of the
act of 1909 (Laws of 1909, p. 202,) is an unqualified declaration
that all machinery and appliances of the character mentioned shall
be so located, wherever possible, as not to be dangerous to em-
ployees or shall be properly enclosed, fenced or otherwise pro-
tected, and the duty so imposed is absolute and not dependent upon
any notice from the factory inspector.

2. SAME—*when declaration sufficiently shows that machine was
so located as to be dangerous to employees.* If the declaration
shows that the machine which caused the plaintiff's injury was of
such a character that it could not be so located as not to be dan-
gerous to employees, such fact, together with the allegation that
it was not protected, is sufficient to bring the case within the act
of 1909 (Laws of 1909, p. 202,) without an express allegation as
to its location.

3. SAME—*object and effect of the act of 1909, concerning en-
closing of dangerous machinery.* The object of the act of 1909,
concerning the enclosing of dangerous machinery, is to provide,
through the exercise of the police power of the State, for the
health, safety and comfort of employees in factories, mercantile
establishments, mills and workshops, and its effect is to create a
new situation in the relation of master and servant and to change
the common law duty of the master.

4. SAME—*act of 1909 increases the standard of the master's
duty to his employees.* Under the act of 1909 (Laws of 1909,
p. 202,) the measure of the master's duty is no longer to merely
use reasonable care to furnish a safe place and safe machinery
and tools to his employees, but in addition to such reasonable care
he must use in his business the means and methods provided in
the statute for the safety of such employees.

5. SAME—*the master owes to each person in his employ the
specific duty of guarding machinery.* Under the act of 1909 the
guarding of the machinery therein mentioned is an absolute duty
required of the master for the protection of his employees, and he
owes such duty to each person in his employ, cannot delegate it to
another nor contract against his neglect or failure to perform it.

6. SAME—*an employee does not assume risk of master's viola-
tion of the act of 1909.* An employee does not, by working with

an unguarded machine with knowledge that it is unguarded, assume the risk of injury from the master's failure to comply with the act of 1909 requiring such machine to be suitably guarded, and if the employee is injured by reason of such condition the doctrine of the assumption of risk is no defense to his right to recover damages. (*Browne* v. *Siegel, Cooper & Co.* 191 Ill. 226, distinguished.)

APPEAL from the Appellate Court for the Second District;—heard in that court on writ of error to the Circuit Court of Kane county; the Hon. DUANE J. CARNES, Judge, presiding.

JOHN M. RAYMOND, and JOHN K. NEWHALL, (R. S. EGAN, of counsel,) for appellant.

J. C. MURPHY, and E. L. LYON, for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

The appellant sued the appellee for damages on account of the loss of three fingers of his left hand. The court directed a verdict for the defendant and entered a judgment against the appellant, which the Appellate Court affirmed. A certificate of importance and an appeal to this court were granted.

The appellee operated a factory in which power-driven machinery was used, and employed the appellant to run a jointer,—a machine used in shaping and planing wood, having knives, revolving at a speed of twenty-six hundred revolutions a minute, extending along its surface and in plain sight at all times, whether the machine was in operation or not. These knives were not covered or protected by a guard or device of any kind. On the second day of his work with the jointer the plaintiff, while standing by its side, was bumped into by another workman, and in order to prevent himself from being thrown into the unprotected moving belt which operated it, he caught with his left hand the gauge on top of the jointer. His hand, being wet with

perspiration, slipped from the gauge into the knives and three of his fingers were cut off. The appellant contends that appellee was required to enclose or protect the knives of the jointer by "An act to provide for the health, safety and comfort of employees in factories, mercantile establishments, mills and workshops in this State, and to provide for the enforcement thereof." (Hurd's Stat. 1909, p. 1102.) The appellant knew that the jointer was a dangerous machine, that the knives were revolving rapidly and were unguarded, and that his fingers would be cut off if he got them in the machine.

Some of the counts of the declaration charge the appellee with negligence, without regard to the statute, either in failing to furnish the appellant a reasonably safe machine with which or a reasonably safe place in which to work. It will be unnecessary to consider these counts, for it may be conceded that but for the statute the appellant would be held to have assumed the risk of the unprotected knives and therefore to be barred of a recovery on those counts, and yet, if the other elements of a recovery were present, he would be entitled to have the cause submitted to the jury on the counts charging a violation of the statute requiring the machine to be protected, unless the appellant can be held to have assumed also the risk incident to such violation of the statute.

It is first contended in support of the judgment that the act imposed no obligation on the appellee until after notification by the factory inspector. Sections 1 and 23 of the act are as follows:

"Section 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly:* That all power-driven machinery, including all saws, planers, wood-shapers, jointers, sand-paper machines, iron mangles, emery wheels, ovens, furnaces, forges and rollers of metal; all projecting set-screws on moving parts; all drums, cogs, gearing, belting, shafting, tables, fly-wheels, flying shuttles

and hydro-extractors; all laundry machinery, mill gearing and machinery of every description; all systems of electrical wiring or transmission; all dynamos and other electrical apparatus and appliances; all vats or pans, and all receptacles containing molten metal or hot or corrosive fluids in any factory, mercantile establishment, mill or workshop, shall be so located wherever possible, as not to be dangerous to employees or shall be properly enclosed, fenced or otherwise protected. All dangerous places in or about mercantile establishments, factories, mills or workshops, near to which any employee is obliged to pass, or to be employed shall, where practicable, be properly enclosed, fenced or otherwise guarded. No machine in any factory, mercantile establishment, mill or workshop, shall be used when the same is known to be dangerously defective, and no repairs shall be made to the active mechanism or operative part of any machine when the machine is in motion.

"Sec. 23. Whenever, by the provisions of this act, it is made the duty of any person, firm or corporation within this State, to make or install any alterations, additions or changes, the same shall be made and installed in conformity with the provisions of this act, and completed within a reasonable time after notification by the chief State factory inspector or his deputy."

Section 25 makes it the duty of the chief State factory inspector and his assistant and deputies to enforce the provisions of the act, and section 26 imposes penalties for their violation.

Section 1 is an unqualified declaration that all machinery and appliances of the character mentioned shall be so located, wherever possible, as not to be dangerous to employees, or shall be properly enclosed, fenced or otherwise protected. The duty is absolute and not dependent upon any notice from the inspector. (*Arms* v. *Ayer*, 192 Ill. 601.) In that case the statute required the erection of fire-escapes

on certain buildings. Section 3 required the factory inspector to serve notice for the erection of such fire-escapes upon buildings not provided with fire-escapes, in accordance with the act, and section 4 provided that an owner not complying with such notice within thirty days should be fined. It was held that the duty to provide fire-escapes was not dependent upon the performance of any duty by the inspector. *McRickard* v. *Flint,* 114 N. Y. 222; *Willy* v. *Mulley,* 78 id. 310; *Rose* v. *King,* 49 Ohio St. 213.

It is next insisted that the statute requires the machinery mentioned in section 1 to be so located as not to be dangerous to employees, or to be properly enclosed, fenced or otherwise protected, while the allegation and proof are only that the jointer was not protected, without showing that it was so located as to be dangerous to employees. One count, at least, of the declaration described the machine and its . whirling knives, so that it was manifest that it could not be so located as not to be dangerous to the employees who were working with it. It was not necessary to use exactly that language, but it was enough to show that the machinery was dangerous to employees and was not protected.

It is urged that the proof does not sustain the allegation that it is practicable to guard the jointer, and to operate it while so guarded as to be reasonably safe for employees. A witness who was a mechanical engineer and draughtsman testified that he was familiar with the kind of jointer by which the appellant was hurt and the manner of its operation; that such a jointer was in use in the shop of the company by which he was employed; that a guard was used over the knives and that such guard is a practical device. This evidence tended to prove the practicability of a guard for the jointer.

The serious question in the case is whether the appellant assumed the risk incident to the appellee's violation of the statute. Stated generally, the question is: Does a servant who continues in the master's employ with full knowledge

of the violation by the master of a statute passed for the protection of the servant in his work, and of the consequent danger to himself, assume the risk of injury from such violation? There is a hopeless conflict in the answers to this question given by the courts of the various jurisdictions in the United States. The legislatures of the various States of the Union, as well as Congress, have enacted a great variety of laws intended for the protection of persons working in mills and factories, operating or working with or about railroad trains, cars, locomotives or other machinery, or working in places or under conditions which, unless special provision is made for their protection, expose them to risks to which they ought not to be subjected. Some of these, as the Railway Safety Appliance act in Illinois, and the act of Congress on the same subject, expressly provide that an employee shall not be deemed to have assumed the risk because of continuing in his employment, or in the performance of the duties of such employment, after knowledge of the violation of the act. Others declare that no contract of employment shall constitute a defense to any action for an injury caused by a violation of the act, or contain provisions of a similar nature. In still others, as in the statute now before us, no direct provision as to the assumption of risk is found, and in such cases it is held that the master cannot avail himself of the defense of assumption of risk where the injury complained of has resulted from his neglect of the duty imposed upon him by the statute, in Arkansas, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Missouri, Oklahoma, Oregon, North Carolina, Pennsylvania, Vermont and Washington. On the other hand, it has been held that such defense is available to the master in Alabama, Colorado, Maine, Massachusetts, Minnesota, Montana, New Jersey, New York, Rhode Island and Wisconsin. The same contradictory decisions are found in the Federal courts in different circuits as in the State courts. *Johnson* v. *Mammoth Vein Coal Co.* 88 Ark.

243; *St. Louis, Iron Mountain and Southern Railway Co.* v. *White,* 93 id. 368; *Monteith* v. *Kokomo Wood Enameling Co.* 159 Ind. 149; *Poli* v. *Numa Block Coal Co.* 149 Iowa, 104; *Western Furniture Co.* v. *Bloom,* 76 Kan. 127; *Harley* v. *Texas Railway Co.* 113 La. 533; *Low* v. *Clear Creek Coal Co.* 140 Ky. 754; *Sipes* v. *Michigan Starch Co.* 137 Mich. 258; *VanDoon* v. *Heep,* 160 id. 199; *Durant* v. *Lexington Coal Co.* 97 Mo. 62; *Hill* v. *Saugested,* 53 Ore. 178; *Biles* v. *Seaboard Air Line Railway Co.* 143 N. C. 78; *Sans Bois Coal Co.* v. *Janeway,* 22 Okla. 425; *Valjago* v. *Carnegie Steel Co.* 226 Pa. 514; *Kilpatrick* v. *Grand Trunk Railway Co.* 74 Vt. 288; *Hall* v. *West & Slade Mill Co.* 39 Wash. 447; *Anderson* v. *Pacific National Lumber Co.* 60 id. 415; *Denver and Rio Grande Railroad Co.* v. *Gannon,* 40 Colo. 195; *Birmingham Railway and Electric Co.* v. *Allen,* 99 Ala. 359; *Gillin* v. *Patten and Sherman Railroad Co.* 93 Me. 80; *Keenan* v. *Edison Electric Illuminating Co.* 159 Mass. 379; *Marshall* v. *Norcross,* 191 id. 568; *Seeley* v. *Tennant,* 104 Minn. 354; *Rase* v. *Minneapolis, St. Paul and Sault Ste. Marie Railway Co.* 107 id. 260; *Osterholm* v. *Boston and Montana Mining Co.* 40 Mont. 508; *Mika* v. *Passaic Print Works,* 76 N. J. L. 561; *Knisley* v. *Pratt,* 148 N. Y. 372; *Langlois* v. *Dunn Worsted Mills,* 25 R. I. 645; *Helmke* v. *Thilmany,* 107 Wis. 216; *Narramore* v. *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* 96 Fed. Rep. 298; *St. Louis Cordage Co.* v. *Miller,* 126 id. 495; *Denver and Rio Grande Railroad Co.* v. *Norgate,* 141 id. 247.

These are some of the cases in which the question has been considered. There are many others. Those cited illustrate most of the phases in which the question has arisen. Reasons for distinguishing some of these apparently opposing decisions may be found in the differing details of the legislative acts under consideration, but an analysis of the cases for this purpose is not worth while here, because, when all is said, there remains an irreconcilable conflict in

the cases. The decision of *Poli* v. *Numa Block Coal Co. supra,* is not in accordance with the prior decisions of the Supreme Court of Iowa in *Sutton* v. *DesMoines Bakery Co.* 135 Iowa, 390, and *Martin* v. *Chicago, Rock Island and Pacific Railroad Co.* 118 id. 148, but it has since been followed in *Stephenson* v. *Sheffield Brick and Tile Co.* 151 Iowa, 371, and is to be regarded now as the doctrine of that court.

Most of the cases holding that there is no assumption by a servant of the risk of violation by the master of a statutory duty imposed for the protection of the servant cite and rely upon the case of *Narramore* v. *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* 96 Fed. Rep. 298, (37 C. C. A. 499, 48 L. R. A. 68,) decided by the United States Circuit Court of Appeals for the Sixth Circuit on July 5, 1899. The case was an action for personal injuries to a switchman in the defendant's railroad yards occasioned by his getting his foot caught in a guard-rail which the defendant had not blocked, in violation of a statute of Ohio which required the blocking of guard-rails so as to prevent the feet of employees from being caught in them and prescribed a penalty for the violation of the act. The trial court directed a verdict for the defendant on the ground that the defendant's failure to block its switches and rails being obvious, the plaintiff must be held to have assumed the risk notwithstanding the statute. The judgment was reversed, and in the opinion it is said that "assumption of risk is a term of the contract of employment, express or implied from the circumstances of the employment, by which the servant agrees that dangers of injury obviously incident to the discharge of the servant's duty shall be at the servant's risk." Proceeding upon the theory that the doctrine of the assumption of risk rests really upon contract, the court holds that a contract to waive the performance of a duty imposed by statute and enforceable by a

criminal prosecution will not be recognized by a court but is void.

The case of *Knisley* v. *Pratt, supra,* decided by the Court of Appeals of the State of New York in 1896, is cited in a number of the cases which sustained the defense of assumption of risk where the act complained of is the violation of a statutory duty, and the reasoning is substantially the same in all such cases. The New York statute required all cog-wheels to be covered in factories where women were employed, and the plaintiff, who was a woman engaged in cleaning machinery while it was in motion, was injured by being caught in the unprotected cog-wheels and in consequence lost her arm, though a compliance with the statute, which was entirely practicable without impairing the efficiency of the machinery, would have been a complete protection to her. The court differentiates ordinary risks and obvious risks, holding that the rule of the assumption of risk in the two cases is entirely distinct. Doubt is expressed as to whether the assumption of obvious risks can be said to rest wholly upon the implied agreement of the employee, and the language used by the Supreme Judicial Court of Massachusetts in the case of *O'Maley* v. *South Boston Gaslight Co.* 158 Mass. 135, is quoted, as follows: "The doctrine of the assumption of the risks of his employment by an employee has usually been considered from the point of view of a contract, express or implied, but, as applied to actions of tort for negligence against an employer, it leads up to the broader principle expressed by the maxim *volenti non fit injuria.* One who, knowing and appreciating a danger, voluntarily assumes the risk of it has no just cause of complaint against another who is primarily responsible for the existence of the danger. As between the two, his voluntary assumption of the risk absolves the other from any particular duty to him in this respect and leaves each to take such chances as exist in the situation, without a right to claim anything from the other. In

such a case there is no actionable negligence on the part of him who is primarily responsible for the danger." The opinion of the Court of Appeals then proceeds: "Where the obvious risks of the business result in injury, the inability of the employee to sue is due to the fact that he voluntarily assumed those risks, not necessarily under an implied contract so to do, but by an independent act of waiver evidenced by his entering the employment with a full knowledge of all the facts. This distinction is not, however, of great importance in the view we take of the statute and its effect upon the rights of the parties. We are of the opinion that there is no reason, in principle or authority, why an employee should not be allowed to assume the obvious risks of the business, as well under the Factory act as otherwise. There is no rule of public policy which prevents an employee from deciding whether, in view of increased wages, the difficulties of obtaining employment, or other sufficient reasons, it may not be wise and prudent to accept employment subject to the rule of obvious risks. The statute does, indeed, contemplate the protection of a certain class of laborers, but it does not deprive them of their free agency and the right to manage their own affairs."

The doctrine of the assumption of risk is firmly established as a part of the law of master and servant. The relation of master and servant exists only by virtue of contract, and to that relation, the instant it is created, the law attaches the doctrine of the assumption of risk. Under that doctrine the servant assumes all the ordinary risks incident to the business, all the extraordinary risks of which and of the danger of which he has knowledge, and all other obvious risks, and this whether any of such risks existed at the time of his employment or may have come into existence subsequently, provided, only, they have come to his knowledge. This condition attaches at the time of his employment and continues unchanged during his employment.

It is an incident of the relation and has its origin in the contract by which that relation is formed. It becomes a part of the contract because the law attaches the liability or obligation to the contract.

It may be that the ground of the doctrine of assumption of risk, as well as of its extension to known extraordinary risks and to obvious risks, is the maxim *volenti non fit injuria,* but, nevertheless, it is only as an incident of the contract of employment,—as a part of such contract,—that it comes into existence at all. A waiver of the benefit of the statute is in the nature of a contract. It is an assent to a change in the servant's rights and liability under his contract of employment. His conduct may be evidence of such assent but it does not change the character of the relation.

The assumption of risk by the servant is not different in its character from the obligation of the master to use reasonable care to furnish the servant a reasonably safe place in which to work and reasonably safe tools to work with. In neither case is the obligation an express term of the contract but in each case it arises out of the contract by operation of law. While the master is bound to reasonable care for the safety of the servant's place and tools, he is not bound to the highest degree of care. He is not bound to furnish a place that is absolutely safe or the safest possible place, but only one that is reasonably safe. He is not bound to furnish the safest tools or machinery or the best and most improved, but only such as are reasonably safe. The master may conduct his business in his own way though another way would be less hazardous, and the servant who enters his employ knowing the method in which the business is conducted assumes the risk of such method.

The doctrine of assumption of risk in this class of cases is of modern origin. Its application to the law of master and servant was first suggested by Lord Abinger in *Priestly* v. *Fowler,* 3 M. & W. 1, and was first declared in this country in *Farwell* v. *Boston and Worcester Railroad Cor-*

*poration,* 4 Metc. 49, in 1842. The opinion in that case, written by Chief Justice Shaw, places the doctrine squarely on the basis of contract, and its reasoning has been universally adopted by the courts of this country. Speaking of the exemption of the master from liability to his servant for an injury through the negligence of a servant of the same master engaged in a different department of duty, it is said: "The master is not excused from liability, in such case, because the servant has better means of providing for his safety when he is employed in immediate connection with those from whose negligence he might suffer, but because the implied contract of the master does not extend to indemnify the servant against the negligence of anyone but himself, and he is not liable in tort as for the negligence of his servant because the person suffering does not stand in the relation of a stranger, but is one whose rights are regulated by contract, express or implied." The mutual rights and liabilities of master and servant were universally determined upon this basis for half a century without question, until legislation of the character of that now in question, which is of much more recent origin than that of the assumption of risk, began to be adopted in various States. Then the theory began to be asserted that the doctrine had its origin, not in contract but in the maxim *volenti non fit injuria,* and that the maxim applied equally whether the risk assented to arose from mere neglect or the violation of a statutory duty. Whatever the origin of the doctrine, in the end it is the servant's agreement that creates the assumption of risk. The servant must be *volens,*—that is, willing, consenting, agreeing,—and to apply the maxim amounts to nothing other than to say the law regards the servant as consenting to existing conditions by continuing his service with knowledge of the conditions,—that is, that he agrees to them and assumes them as a part of his contract. It has been doubted whether the maxim has any application where there has been a breach by a

defendant of a statutory obligation. *Baddeley* v. *Granville,* L. R. 19 Q. B. Div. 425; *Yarmouth* v. *France,* id. 647; *Wilson* v. *Merry,* 19 L. T. (N. S.) 30.

The passage of a law like that now under consideration implies that the class of employees for whose protection it was intended had not been able to protect themselves without it. Its object, as indicated by the title of the act, is to provide for the health, safety and comfort of employees in factories, mercantile establishments, mills and workshops in this State, and the authority for it is found in the police power of the State. The effect of it is to create a new situation in the relation of master and servant, and to present the new question whether the doctrine of assumption of risk heretofore applied to that relation should apply in the same way to the new conditions. The duty of the master has been changed. He may no longer conduct his business in his own way. He may no longer use such machinery and appliances as he chooses. The measure of his duty is no longer reasonable care to furnish a safe place and safe machinery and tools, but in addition to such reasonable care he must use in his business the means and methods required by the statute. The law does not leave to his judgment the reasonableness of enclosing or protecting dangerous machinery, or permit him to expose to increased and unlawful dangers such of his employees as may be driven by force of circumstances to continue in his employ rather than leave it and take chances on securing employment elsewhere under lawful conditions. The guarding of the machinery mentioned in the statute is a duty required of the master for the protection of his workmen, and he owes the specific duty to each person in his employ. To omit it is a misdemeanor subjecting him to a criminal prosecution. The necessity for such legislation is suggested by a consideration of a sentence from the opinion in the *Knisley case* which says: "There is no rule of public policy which prevents an employee from deciding whether, in view of in-

creased wages, the difficulties of obtaining employment, or other sufficient reasons, it may not be wise and prudent to accept employment subject to the rule of obvious risks." Notwithstanding the theoretical liberty of every person to contract for his labor or services and his legal right to abandon his employment if the conditions of service are not satisfactory, practically, by stress of circumstances, poverty, the dependence of his family, scarcity of employment, competition or other conditions, the laborer frequently has no choice but to accept employment upon such terms and under such conditions as are offered. Under such circumstances experience had shown, before the passage of the statute, that many employers would not exercise a proper degree of care for the safety of their workmen. The servant had to assume the risk of injury and the master took the chance of a suit for damages. It was to meet this precise situation and protect employees in such situation that this legislation was adopted. It imposes upon the master an absolute, specific duty,—one which he cannot delegate and against his neglect of which he ought not to be allowed to contract. If the employee must assume the risk of the employer's violation of the statute the act is a delusion so far as the protection of the former is concerned. He is in the same condition as before it was passed. He is compelled to accept the employment; he must assume the risk; when he is killed or crippled, he and those dependent on him have no remedy and the law is satisfied by the payment of a fine. The more completely the master has neglected the duty imposed upon him by statute for the servant's protection the more complete is his defense for the injury caused by that neglect. Justice requires that the master, and not the servant, should assume the risk of the master's violation of the law enacted for the servant's protection, and in our opinion this view is in accordance with sound principles of law.

For many years we have held, in the construction of the Mining act, that neither assumed risk nor contributory negligence is available as a defense to a suit for damages caused by a willful violation of the provisions of that act. (*Bartlett Coal and Mining Co.* v. *Roach,* 68 Ill. 174; *Litchfield Coal Co.* v. *Taylor,* 81 id. 590; *Catlett* v. *Young,* 143 id. 74; *Carterville Coal Co.* v. *Abbott,* 181 id. 495; *Western Anthracite Coal and Coke Co.* v. *Beaver,* 192 id. 333; *Spring Valley Coal Co.* v. *Patting,* 210 id. 342; *Kellyville Coal Co.* v. *Strine,* 217 id. 516; *Waschow* v. *Kelly Coal Co.* 245 id. 516.) It is true that these decisions were based partly on the language of the section which gives an action for an injury occasioned by a "willful" violation of the act, and partly on the requirement contained in section 29 of article 4 of the constitution, that the General Assembly shall pass laws for the protection of operative miners. The reasoning on which they are based is, however, applicable to the present case, as is the language in *Carterville Coal Co.* v. *Abbott, supra:* "To hold that the same principle as to contributory negligence should be applied in case of one who is injured in a mine because the owner, operator or manager totally disregarded the statute, as in other cases of negligence, is to totally disregard the provisions of the constitution, which are mandatory in requiring the enactment of this character of legislation, and would destroy the effect of the statute and in no manner regard the duty of protecting the life and safety of miners." A constitutional law is of as much force as the constitution itself. This law was passed to protect employees, and in view of the construction given to the Mining act in regard to the assumption of risk, the General Assembly must have supposed that the same construction would be given to this act in that regard. The Supreme Courts of other States have construed acts designed for the protection of miners in the same way in regard to the assumption of risk though no constitutional provision was involved. *Johnson* v. *Mammoth Vein Coal*

*Co. supra; Poli* v. *Numa Block Coal Co. supra; Low* v. *Clear Creek Coal Co. supra.*

Counsel for the appellee have cited the case of *Browne* v. *Siegel, Cooper & Co.* 191 Ill. 226, as sustaining their contention that the statute does not preclude the defense of assumption of risk. The plaintiff's decedent there was killed by falling down an elevator shaft, and the negligence charged was a failure to comply with an ordinance of the city of Chicago requiring all elevator shafts to have iron doors opening from the inside, only. The decedent was a porter employed by the defendant cleaning up the floors of a store building at night. The opening to the elevator was closed with a wire gate which could be raised from the outside, and on the night of his death the decedent's foreman went to the gate and raised it, the elevator not being there, and leaned into the shaft to see where the elevator was. The decedent, following the foreman and in the dim light not observing that the elevator was not there, stepped into the shaft and was killed. The case was regarded as one of contributory negligence as well as of assumed risk, and the judgment rendered on a verdict directed for the defendant was affirmed. The ordinance in that case did not, as does the statute here, impose a specific duty for the protection of employees, but was a general ordinance for the regulation of the operation of elevators in the interest of the public generally. It did not impose a specific duty in favor of any person or class of persons. This is the same distinction which was referred to in the *Narramore case, supra,* in distinguishing the Massachusetts cases, which were not suits under a statute enjoining a specific duty upon a master for the protection of his servants but were suits under an employer's liability act, which relieved the servant from certain defenses by the master in suits for injury sustained in the master's service but did not attempt to change the master's duty to the servant or to change the standard of negligence between them as it was fixed at common law. The

Supreme Court of Indiana, in *Monteith* v. *Kokomo Wood Enameling Co. supra,* noted a distinction between employers' liability statutes which provide, in general terms, that the employer shall be liable for an injury to an employee where the injury is occasioned by reason of defects in the condition of ways, works, tools, plants and machinery, etc., and statutes which require of employers the performance of a specific duty, such as to fence or guard dangerous machinery. (*American Rolling Mill Co.* v. *Hullinger,* 161 Ind. 673.) In the latter case assumption of risk is not available as a defense, and in this particular the ordinance in the case of *Browne* v. *Siegel, Cooper & Co.* differs from the statute in the present case.

The circuit court erred in refusing to submit the case to the jury. Its judgment, and that of the Appellate Court, will be reversed and the cause remanded to the circuit court.

*Reversed and remanded.*