### Frank A. Renehan, Appellee, v. John Mohr & Sons, Appellant.

### Gen. No. 17,056.

1. MASTER AND SERVANT—*when machine is not defective.* It cannot be maintained that a metal punching machine is improperly or defectively constructed where the evidence satisfactorily shows that the construction and use of the machine in the respects complained of was usual and like that of similar machines used in other establishments.

2. MASTER AND SERVANT—*when evidence of negligence in furnishing defective punching machine is insufficient.* Where it is contended that the tail stock of a metal punching machine contained

no set screw for holding a die and the evidence shows that there had never been a set screw since the injured servant was employed; that prior thereto the use of one had not been satisfactory; and the contention that the shoulder of the tail stock had worn away, allowing a die to become tilted, is directly contradicted by the only witness who testified upon the point; it further appearing that the machine was such as was customarily used in other shops, there is no evidence of negligence on the part of the master.

3. MASTER AND SERVANT—*when risk of using defective punching machine is assumed.* An experienced boilermaker, familiar with a metal punching machine, was struck in the eye by a flying piece of steel while operating it. The steel was not from the metal being punched and it did not appear where it came from or what was the cause of its flying off, the plaintiff contending that a die became loose and out of alignment with the punch, which struck it, causing the splinter to fly off. The die had become loose several times that day and was fixed by the plaintiff and a small handwheel was provided for moving the punch up to test the proper alignment. The handwheel was not used by the plaintiff and at the time of the injury he was operating the punch continuously at forty strokes a minute. *Held*, the plaintiff assumed the risk.

Appeal from the Circuit Court of Cook county; the Hon. RICHARD S. TUTHILL, Judge, presiding. Heard in this court at the October term, 1910. Reversed with a finding of fact. Opinion filed June 14, 1912.

WINSTON, PAYNE, STRAWN & SHAW, for appellant; JOHN BARTON PAYNE, JOHN D. BLACK and JOHN C. SLADE, of counsel.

RICHARD J. FINN, for appellee.

MR. PRESIDING JUSTICE BALDWIN delivered the opinion of the court.

This is an appeal from a judgment for $2,500 upon a verdict for that amount entered in the Circuit Court of Cook county, in favor of appellee and against appellant. Appellee, a boilermaker, was operating a horizontal punch in the shop of appellant in South Chicago, and on the 12th day of April, 1909, was struck by a flying particle of steel, by which the sight of one eye was destroyed. At the time of the accident, ap-

pellee had been working as a boilermaker in appellant's plant for about fourteen months, and in the same capacity for other companies for about nine years, previous to which time he had been an apprentice in the boilermaking business for about three years. He had become proficient in the various branches of the boilermaking business, including the use of machines designed for punching holes in boiler plate. The machine in use by him at the time of the accident was one known as a horizontal punch, and it had been in constant use at that place during the entire term of appellee's employment there, and for several years previously. It was a heavy machine, operated with electric power, and capable of punching cold boiler plate one inch thick. Near one end of it was a rectangular notch or "throat" some eight inches deep and four or five inches wide, extending transversely across the top; in one of the perpendicular sides of this throat was set a heavy casting, known as the "tail stock," sometimes called "die block," or "die holder," which had in it a round hole about one inch deep and two inches in diameter. The die was cylindrical in shape, about one inch long, having a circular hole extending entirely through it, and was placed in the hole in the tail stock. Directly opposite the die and tail stock, in the other side of the throat, was the punch stem and the mechanism operating it. The machine was very powerful, the punch being capable of striking a blow of seventy tons. Between the two sides of the throat was the "stripper," an upright piece of iron or steel with a U-shaped opening through which the punch passed when in motion, its purpose being to remove from the punch, on its backward motion, any metal which might cling to it after the hole had been made. When in proper alignment, the punch stem would penetrate the metal to be punched, enter the hole in the center of the die, and force the piece of metal punched out ahead of it through the hole in the tail stock to the back of the

machine.    There was a small handwheel at the side
of the machine, by means of which the punch could be
slowly moved into the die; this was used to determine
whether or not the die was in proper alignment.    The
dies were all made in the shop and were from 1-16 to
1-8 inch less in diameter than the hole in the tail stock;
they were made this way so as to allow an adjust-
ment of the die with reference to the point where the
punch would strike.    This adjustment was accomplished
by wrapping pieces of tin or sheet iron (called "shims"
or "liners") around the die to the required thickness,
and then driving the die, with these shims, into the hole
in the tail stock.    These shims served the double pur-
pose of holding the die tight in its socket, and of prop-
erly aligning it with the punch.    This method of set-
ting the die had been in use during the entire term
of appellee's employment, and for eight or ten years
previously.    After inserting the die, with the shims
around it, in the tail stock, the operator would test the
machine with the handwheel.    If the punch stem en-
tered the hole in the die squarely and the die was
tight in the socket, the punch was ready for use.    It
was set in motion by pressing a foot-pedal at the base
of the machine.

On the day of the accident, appellee was punching
holes in the flange of a nozzle.    The nozzle was a large
pipe six feet in diameter and about six feet long, made
of 3/8 inch boiler steel.    One end was cut out so as to fit
against the side of a circular tank and a flange turned
on the edges.    Appellee, at the time of the accident,
was punching rivet holes in this flange and also trim-
ming off the edges.    This large pipe weighed several
hundred pounds, and was supported from above by a
traveling crane and chain hoist.    Appellee had two
helpers who acted under his instructions in shifting
the nozzle and adjusting it in position.    During his em-
ployment with appellant, appellee had punched at least
two such nozzles on the machine as well as some angle
irons; each of these operations requiring the use of the

punch several hours. Though he had never used a horizontal punch, like this one, until employed by appellant, he had observed them while working in at least two other shops, and had frequently operated vertical punches before working for appellant, having begun to use them some ten years before the accident. The punches and dies, which he had used in these vertical punches, were all of tool steel and of the same general structure as the punch stem and die on the machine in question. He had also used the other horizontal machine in appellant's shop two or three times before the accident.

Shortly before ten o'clock on the day he was injured, after having marked the places for the rivet holes by making dents with a hand-punch in the flange, and having marked off the edges which had to be cut off, he told the foreman of the shop that he had the job ready; the foreman then told him, "go take it over to that punch and punch it." The work was hanging on the overhead hoist, and the die was already set; he tried the punch with the handwheel, and, finding it right, began his work. The method of working the machine was to first move the punch up with the handwheel until the small point in the center of the punch struck the dent previously made in the flange to indicate the center of the hole; then press the pedal at the base; this turned on the power and the punch would immediately pass through the metal and return to position. The nozzle would then be shifted so as to have the next dent in line with the punch, and the operation repeated. When punching rivet holes, which were about two and one-half inches apart, it was generally necessary to shift the nozzle before each punch. The same machine was also used for cutting off the surplus edge of the flange.

On the day of the accident, appellee's method was first to punch two or three rivet holes, then cut off the surplus edge opposite. With the exception of twenty-five minutes had for dinner, he worked on the punch

steadily from ten o'clock in the morning until three o'clock in the afternoon. In that interval of four and one-half hours, the die came loose once or twice, when he put the shims back in place again and continued the work.

It appeared further that he put his hand on the die ten or twelve times to see whether it was securely in place, as he found it had a tendency to become loose when used by reason of the fact that a portion of the metal forced into the die ahead of the punch would sometimes get wedged between the outside of the punch stem and the inside of the die so that when the punch drew back it would pull the die with it.

At the time of the accident, appellee was punching the surplus edge off, and, instead of stopping the machine after each punch, he kept the punch going at the rate of about forty strokes a minute by retaining his foot on the pedal. Suddenly something struck him in the eye. He let go of the material, looked at the die and found that it had become loose and tipped a little. A small piece of steel, approximately 2-5 of an inch long, and resembling the end of a carpet tack, was taken out of his eye. Its quality was what is known as "tool steel," a harder grade of metal than that being punched. There is no evidence in the case showing where the piece of steel in question came from, nor as to the cause of its flying off. Appellee's contention is that the die became loose and the hole in the center slightly out of line with the punch so that the punch, instead of entering the hole squarely, struck the edge and caused the splinter of steel to fly off from either the die or the punch.

Two of appellee's witnesses, both having been in the employ of appellant, testified that the machine was used in the same way all the time that they worked there, and that the die was always set in position by the use of shims, and that it tended to work loose with use—sometimes as often as once in half an hour. It appeared that at some time the tail stock had been

bored for a set screw, though the witnesses agreed that it had never been used on the machine other than experimentally, and that before the employment of appellee. The foreman also testified that, after an extended experience in the boilermaking business in various shops, the method of lining up the die with shims was the best and most practical one for retaining it in position.

We are asked to reverse the judgment upon the contentions that appellee assumed the risk; that the accident was not due to any negligence of the appellant, and that appellee's injury was due to his own negligence.

The declaration charged that appellant permitted and allowed the punch in question to become and remain in a dangerous and defective condition, and permitted the die holder and set screw to be and remain broken and out of order so that it became necessary to hold the die in place with tin and other metal as a wedge, and that the die was liable at all times to become loose and out of place while the punch was in operation.

The alleged liability of appellant seems to be based upon some or all of the following contentions: (1) that the die was not properly and securely fastened in the tail stock or die holder; (2) that the opening in the tail stock, or die holder, was larger than the die, thus necessitating the use of pieces of tin or sheet iron, called shims or liners, around the die, and, therefore, it was of improper and defective construction; (3) that the hole or opening in the tail stock was oval instead of round; (4) that safety in the operation of the machine required that the die should be held in place by a set screw, and that there was none used in the machine at the time in question; (5) and that the shoulder, or resisting surface in the tail stock, or die holder, against which the die pressed when the machine was in use, had worn away unequally, allowing

the die to become tilted, or cocked, when it was subject to pressure.

As to the first three of these contentions we think the evidence satisfactorily shows that the construction and use of the machine in these respects was usual, and like that of similar machines used in other establishments. Indeed, the foreman, Mr. Thompson, testifying as an expert, declared that there was no better or safer method for holding the die in the die block than that used in the machine at which appellee was working when injured; and there is no testimony to the contrary. Two of the witnesses for appellee testified that the inner surface of the tail stock appeared to be worn away at the top and that it had been in that condition during a considerable time. But appellee testified that instead of being worn away at the top and bottom, the opening was, in fact, cut out and made that way, and he gave as a reason for such construction that they could thereby get the holes closer down to the heel of the flange, thus adding to the utility of the machine, and he particularly stated that he observed that condition the first time he worked on the machine.

From the testimony in the case, it clearly appears that appellee was an experienced boilermaker, and had been employed in this plant for more than a year, and was familiar with the use of the two machines used in punching holes in boiler plate; that the machine which he was using at the time of his injury had been in constant use there, not only during the entire time he was employed there, but for years previously; that, while appellee was employed at this place, he had punched at least two nozzles such as that being constructed at the time he received his injury, and that at each of these operations he spent several hours.

It further appears that in the other places where he had been employed, though he had not used a horizontal punch like the one in question, yet he had observed them while working in at least two other shops,

and he had frequently operated vertical punches during a period of ten years before the accident. He was familiar with the construction and operation of the machine which he was using when he was hurt. The punches and dies he had used in the various vertical punches were all of tool steel and of the same general construction as the punch and die on the machine in question. It appears that it is important that by using the small handwheel he could move the punch slowly into the die and thus determine whether or not it was properly aligned, and during the four and one-half hours he had been working on the machine just before the accident, the die actually came loose once or twice, and appellee himself adjusted it by putting the shims back in place again. He knew perfectly well that the die must be firmly held, and testified to having tightened it once or twice that day. In addition he says he put his hand on the die ten or twelve times that day to ascertain whether it had become loose, and shimmed up the die in the same way that he had done it on other occasions. He testified that he knew the machine would not work properly unless the die was lined up right.

Appellee had two helpers assisting him. By the use of the handwheel he could have tested the alignment of the machine as often as he cared to. Instead of making frequent tests, however, as he might have done, he had been for some time before receiving the injury operating the punch at forty strokes per minute, keeping his foot continuously on the pedal for the purpose.

As to the complaint that the tail stock contained no set screw for holding the die, the evidence shows that there had never been a set screw in the tail stock at any time while appellee was employed in the shop. It appeared that some time before his employment, the tail stock had been drilled and a set screw tried once only, as an experiment, but that it was not found to work satisfactorily, and was at once abandoned. The contention of appellee that the shoulder, or resist-

ing surface of the tail stock or die holder, against which the die pressed when the machine was in use, was worn away and allowed the die to become tilted, or cocked, when it was subjected to pressure, finds no substantial support in the evidence, and the fact is directly contradicted by a witness for appellee who was the only witness who testified upon that point.

After a very careful consideration of all the evidence shown by the record, we think it fails to show any negligence on the part of appellant. Moreover, we think that appellee assumed the risk involved in operating the machine. He knew all about it; he testified that it was in the same condition during his entire fourteen months of service that it was when he began; that he had previously put the shims around the die in the socket. He never saw any set screw in the tail stock for holding the die, but his method was always to put the die in the hole and then shim it up. The die had actually worked loose with him once or twice on the very day of the accident, and he knew that the machine would not work properly unless it was lined up right, and, accordingly, he did it. He also testified to having used the little handwheel on the side of the machine for the purpose of lining up the machine so that if the punch did not go in right he would change the position of the die until it was properly adjusted.

Our Supreme Court has recently said: ''The doctrine of the assumption of risk is firmly established as a part of the law of master and servant.  *   *   * Under that doctrine the servant assumes all the ordinary risks incident to the business, all the extraordinary risks of which and of the danger of which he has knowledge, and all other obvious risks, and this whether any of such risks existed at the time of his employment or may have come into existence subsequently, provided, only, they have come to his knowledge. This condition attaches at the time of his employment and continues unchanged during his employment. It is an incident of the relation and has its

origin in the contract by which that relation is formed. It becomes a part of the contract because the law attaches the liability or obligation to the contract." Streeter v. Western Scraper Co., 254 Ill. 244-253.

While the accident was unfortunate we cannot, upon this record, allow this judgment to stand—first, because the evidence fails to show negligence on the part of appellant, and, second, that under the circumstances shown, appellee must be held to have assumed whatever risk was involved in operating the machine. Having reached this conclusion, the judgment of the court below must be reversed upon findings of fact.

*Judgment reversed with findings of fact.*